IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JASON PIASECKI,              :      CASE NO. 14-CV-7004
          PETITIONER    :
                         :
    v.                     :
                         :
COURT OF COMMON PLEAS OF   :
  BUCKS COUNTY, ET AL.,      :     (CIVIL ACTION)
          RESPONDENTS  :

<u>SUPPLEMENT TO ANSWER IN OPPOSITION TO PETITION FOR WRIT OF
HABEAS CORPUS AND MEMORANDUM OF LAW IN SUPPORT THEREOF
PURSUANT TO U.S.C.S. SECTION 2254, RULE 5</u>

# VOLUME II

KAREN A. DIAZ
DEPUTY DISTRICT ATTORNEY

STEPHEN B. HARRIS
CHIEF OF APPEALS

DAVID W. HECKLER
DISTRICT ATTORNEY

DISTRICT ATTORNEY'S OFFICE
BUCKS COUNTY JUSTICE CENTER – 2nd FLOOR
100 N. MAIN STREET
DOYLESTOWN, PA 18901
#(215) 348-6344

## TABLE OF CONTENTS[1]

**EXHIBIT A:**

AOPC Web Docketing Statement
Commonwealth v. Jason Piasecki, No. CP-09-CR-0005364-2009

**EXHIBIT B:**

PA Super Court Web Docket, Direct Appeal, No. 1397 EDA 2010

**EXHIBIT C:**

Opinion, Trial Court, 11/29/10

**EXHIBIT D:**

Brief for Appellant, Direct Appeal, No. 1397 EDA 2010 (Without Attachments)

**EXHIBIT E:**

Memorandum Opinion, PA Superior Court, No. 1397 EDA 2010, 7/25/11

**EXHIBIT F:**

Petition for Allowance of Appeal, Direct Appeal, No. 608 MAL 2011

**EXHIBIT G:**

PA Super Court Web Docket, PCRA Appeal, No. 1482 EDA 2013

**EXHIBIT H:**

Opinion, PCRA Court, 7/1/13

**EXHIBIT I:**

Brief for Appellant, PCRA Appeal, No. 1482 EDA 2013 (Without Attachments)

---

[1] Pursuant to this Honorable Court's Order of February 6, 2015, the Bucks County Clerk of Courts was directed to forward to this Honorable Court the contents of the Bucks County Clerk of Courts file on Bucks Co. Case No. CP-09-CR-0005364-2009. The AOPC Web Docketing Statement reflects that the Clerk of Courts file contains the relevant notes of testimony, as well as the Court Opinions of the PCRA court and the Pennsylvania Superior Court. Therefore, this Supplement contains those appellate documents that Respondent believes are relevant but are not contained within in the Bucks County Clerk of Courts file.

**EXHIBIT J:**

  **Memorandum Opinion**, PA Superior Court, No. 1482 EDA 2013, 7/25/11

**EXHIBIT K:**

  **Petition for Allowance of Appeal**, PCRA Appeal, No. 178 MAL 2014

# EXHIBIT D

# In The Superior Court of Pennsylvania

## *1397 EDA 2010*

## COMMONWEALTH OF PENNSYLVANIA V. JASON PIASECKI

## *BRIEF OF APPELLANT, JASON PIASECKI*

Appeal from the Judgment of Sentence of April 26, 2010 of the Honorable Rea B. Boylan of the Bucks County Court of Common Pleas in the matter of Commonwealth v. Jason Piasecki, Bucks County Criminal Action No. 5364-2009.

BEGLEY, CARLIN & MANDIO, LLP
BY: Douglas C. Maloney, Esquire
Attorney I.D. #34388
680 Middletown Boulevard
P.O. Box 308
Langhorne, PA 19047
*Attorney for Appellant, Jason Piasecki*

## TABLE OF CONTENTS

I.    Statement of Jurisdiction.................................................................................1

II.   Order in Question..........................................................................................2

III.  Statement of Scope of Review and Standard of Review.......................................3

IV.   Questions Involved........................................................................................4

V.    Statement of the Case.....................................................................................5

VI.   Summary of Argument.....................................................................................12

VII.  Argument.....................................................................................................13

      A.    The Trial Court erred in failing to dismiss the charges due to
           the Commonwealth's destruction of potentially exculpatory.................................13

      B.    The Trial Court erred in failing to dismiss the charges due to the
           Commonwealth's destruction of potentially exculpatory evidence.......................22

      C.    The evidence was insufficient to contain Appellant's conviction
           for knowing Possession of Child Pornography.................................................27

VIII. Conclusion..................................................................................................34

Certificate of Service.............................................................................................35

## APPENDICES

A.    Statement of Matters Complained of on Appeal

B.    Court of Common Pleas Opinion

## TABLE OF AUTHORITIES

### CASES:

Brady v Maryland, 373 US 83 (1963)..........................................................p. 22, 23

Commonwealth v Causey, 833 A. 2d. 165 (Pa. Superior Ct. 2003)........................p.23

Commonwealth v Diggs, 949 A. 2d. 873 (Pa. 2008)......................................p.3

Commonwealth v Diodoro, 970 A. 2d. 1/1/00 (Pa. 2009)..............................p. 27, 28, 29

Commonwealth v E.M.., 735 A. 2d. 654 (Pa. 1999)......................................p.3

Commonwealth v Edmiston, 634 A.2d. 1078 (Pa. 1993).............................. p.16

Commonwealth v. Gonzalez, 979 A. 2d. 879 (2009)......................................p. 18, 19, 20

Commonwealth v Gray, 896 A. 2d. 601 (Pa. Superior Ct. 2006)........................ p.3

Commonwealth v Gwynn, 723 A. 2d. 143, 148 (Pa. 1998)........................p. 13

Commonwealth v Ingram, 814 A. 2d. 264 (Pa. Superior Ct. 2002)...................p. 17, 18, 20

Commonwealth v Jackson, 698 A. 2d. 698 A. 2d. 571 (Pa. 1997) .....................p.3

Commonwealth v Lamana, 7 Pa. D&C 5th (Berks County 2009).....................p. 25, 26

Commonwealth v Mannion, 725 A. 2d. 196, 200-202 (Pa. Superior Ct. 1999).........p.13

Commonwealth v McCarthy, 820 A. 2d. 757 (Pa. Superior Ct. 2003)...................p. 15, 16, 17, 21

Commonwealth v Minnis, 458 A. 2d. 231 (Pa. Superior Ct. 1983).....................p.3

Commonwealth v Moss, 689 A. 2d. 259 (Pa. Superior Ct. 1997)........................p.23

Commonwealth v Moyer, 954 A. 2d. 659 (Pa. Superior Ct. 2008).....................p.15

Commonwealth v Reed, 583 A. 2d. 459, 462-463 (Pa. Superior Ct. 1990)..............p.13

Commonwealth v Small, 559 Pa. 423, 741 A. 2d. 666, 676 (Pa. 1999)....................p. 26

Commonwealth v Wesley, 753 A. 2d. 204 (Pa. 2000)...............................................p. 27

Commonwealth v Whaley, 434 A. 2d. 147 (Pa. Superior Ct. 1981)......................................p.23, 24

Commonwealth v Whitherspoon, 756 A. 2d. 677 (Pa. Superior Ct. 2000)................................p.16

Commonwealth v Williams, 650 A. 2d. 420, 427 (Pa. 1994).......................................p.13

Miranda v Arizona, 384 U.S. 436 (1966)..........................................................p. 13

United States v Agurs, 427 US 97, 112-113 (1979)...............................................p.24

## STATUTES:

42 Pa. C.S. § 742 ...........................................................................p.   1
18 Pa. C.S. § 6312(d)(1) ............................................................p. 5, 27, 28, 29, 32, 33
Act 2009-15..................................................................................p. 27
18 Pa. C.S. § 4910...........................................................................p. 33

iii

# I.   STATEMENT OF JURISDICTION

This Court has jurisdiction over this matter pursuant to 42 Pa. C.S. §742 as an Appeal from a Judgment of Sentence imposed by the Bucks County Court of Common Pleas.

## II.      DETERMINATION IN QUESTION

The Order in question is the judgment of sentence imposed by the Honorable Rea B. Boylan imposing a 3 year probationary sentence subject to certain special conditions and also subject to the requirement to register as a sex offender for a period of ten years.

### III.    STATEMENT OF SCOPE OF REVIEW AND STANDARD OF REVIEW

This Court's scope of review of a denial of a motion to suppress evidence is that the Appellant Court must consider the evidence of the prosecution and such evidence of the Defendant that, when fairly read in context of the records as whole, remains uncontradicted. Commonwealth v. E.M., 735 A.2d 654 (Pa. 1999). The Appellate Court is bound by the facts as are found and are supported by the record, and may reverse the suppression Court only if legal conclusion drawn from the facts are in error. Commonwealth v. Jackson, 698 A.2d 571 (Pa. 1997).

The review of an Order denying a suppression motion requires a determination of whether the record supports the Trial Court's factual findings and whether the legal conclusions drawn therefrom are free from error. Commonwealth v. Gray, 896 A.2d 601 (Pa. Superior Court 2006).

In reviewing the sufficiency of the evidence to support defendant's conviction, the entire record shall be evaluated by the Appellate Court. Commonwealth v. Diggs, 949 A.2d 873 (Pa. 2008).  The test of sufficiency of the evidence to support a criminal conviction is whether, the evidence construed in the light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences favorable to it, is sufficient to find every element of crime and the identity of the accused beyond a reasonable doubt. Commonwealth v. Minnis, 458 A.2d 231 (Pa. Superior Court 1983).

## IV.  STATEMENT OF QUESTIONS INVOLVED

1.      Did the Trial Court erred in failing to grant Defendant's Motion to Suppress Evidence, specifically, failing to suppress inculpatory statements made by Jason Piasecki during interrogation by Detectives from the Upper Makefield Township and New Britian Township Police Departments and in failing to find that said statements were the product of custodial interrogation when Jason Piasecki, a person who is mentally impaired and functions at a second to third grade level of academic achievement, was separated from his seven year old son by police officers during the course of the interrogation, was not read his so called Miranda rights prior to or during the interrogation and was not otherwise advised of his right to remain silent, to terminate the interrogation, was unable to leave his home, and where the interrogation was in a police-dominated atmosphere.

2.      Did the Trial Court erred in failing to dismiss these charges due to prosecutorial misconduct in destroying potentially exculpatory evidence by repeatedly accessing crucial files, by erasing search term history on the computer, by unplugging the computer and the router.

3.      Was there sufficient evidence to convict defendant of knowing possession of child pornography, where there was no evidence that Mr. Piasecki had intentionally searched for child pornography or had knowingly downloaded child pornography onto his computer, and the child pornography was a very small segment of a great deal adult pornography which Mr. Piasecki had intentionally downloaded on to his computer.  The evidence presented showed that Mr. Piasecki did not know how to delete child pornography acquired via the Limewire file sharing program, there were no other indicia of pedophilia or interest on the part of Mr. Piasecki in child pornography.

4

## V.    STATEMENT OF THE CASE

**A.    Procedural History.**

Defendant was convicted of Possession of Child Pornography (18 Pa C.S. §6312 (d)(1) at a non-jury trial before Honorable Rea Boylan that concluded on January 14, 2010.  On April 26, 2010, Appellant was sentenced to three (3) years probation.  Appellant filed a timely notice of appeal.  A copy of Appellant's Statement of Matters Complaint of an Appeal, and of Judge Boylan's Opinion are attached as appendices.

**B.    Jason Piasecki.**

Jason Piasecki functions at a reading level equivalent to the third grade, and a math level equivalent to the second grade. N.T. 1/11/10, p.176.  He receives Social Security Disability due to his mental impairment.  _Id_ p. 178-179.  (We will refer to Appellant as "Jason" to distinguish him from his father, Joseph Piasecki).

Jason graduated from high school with the help of an Individual Education Plan ("IEP").  He was given additional time to take tests, and actually had tests read to him. Id, pg. 176.  His adoptive mother, Marlene Piasecki, estimates that he has had approximately twenty jobs since he graduated from high school.Id., p.179.  He was unable to work at a Burger King because he was unable to follow simple directions.  He lost a job at a clothing retailer is stock room because he could not match clothing hangers by size.  He lost a job at Toys-r-Us because he could not match orders with the products.  He lost a job a Redners Food Market because he could not pass a simple math test. He was unable to work at a WalMart, despite the assistance of a "job coach" because he lacked basic computer skills. Id., p.179-180. At the time of his arrest, he worked part-time at a low-level security job arranged for him through the Pennsylvania Department of Vocation Rehabilitation.  _Id_. p. 178-179.  His "tools" consisted of a flashlight and a cellular telephone.  If he saw anything suspicious, he was to call his employer.  _Id_.

Jason lives at home with his parents, Marlene and Joseph Piasecki, and his seven year old son, Cory.  When Jason receives his paycheck, he calls his mother Marlene and tells her the amount of his paycheck, and how much cash he would like to keep out.  She performs the simple math

problem and tells him, what to write on the deposit slip to deposit his paycheck and receive the appropriate amount of cash back. Id., p.181.

Jason's son Cory was in the second grade at the time of trial.  At this grade level, Jason was completely unable to help Cory with any math problems as Cory was "even with Jason in math ability". Id, pg. 182.  Jason can, occasionally, help Cory with reading as he can sometimes sound out simple words that Cory still does not understand. Id, p. 183.

In addition to the cognitive disabilities, Jason is under the treatment of a psychiatrist for depression and has been diagnosed as suffering from Asperger's syndrome, which is on the autistic spectrum. Id, p.177, 181.

Several years ago, the Piaseckis helped Jason and his girlfriend, Cory's mother, live in an apartment that the Piaseckis owned. Id, pg. 185.  However, Marlene and Joseph Piasecki had to pay all the bills, make sure that food was in the house and basically ended up "managing their living circumstances".  The experiment was ultimately a failure. Id, p. 185-186.

Even for Jason to obtain his driver's license, the written test had to be read to him by the instructor. N.T. Id., p. 190.

Jason was home at his parents house with his son, Cory, on April 1, 2009 when two plain clothes detectives and two uniformed police officers pulled up to the house, blocked his car in the driveway and knocked on the door.  His, parents, Joseph and Marlene, were not at home.

### b.    Police Investigation

One of the plain clothes detectives, Jeff Cummins of the New Britian Township Police Department was a member of a police unit called the "Internet Crimes Against Childrens Task Force". Id p. 8.

Using police software, Detective Cummins had determined that videos of child pornography were located on a computer at the Piasecki household. Id., p. 9-12.  The computer itself was registered to Marlene Piasecki and was registered to her address at 110 Overlook Avenue, Washington Crossing, Pa. _Id_ p. 20.

Detective Cummins used software which conducted a search of the Gnutella file sharing network.  Using file sharing software, persons can share files with complete strangers.  A person conducting a search using Limewire software will type in a search word and the software will search

throughout the Limewire network and secure video or audio files that match the search term.  Id.,

p. 9-11.  Simply being a member of the Gnutella network, and having your computer turned on, can

result in file sharing, that is, someone else on the Gnutella network obtaining video or audio files

from one's computer.  Persons (or their computers) participating in the file-sharing Gnutella network

are called "peers".  Searches are routed through centralized computers called "ultra peers".  _Id_, p.

10.

The Limewire software allows for persons to restrict the file sharing function of the software.

However, the default setting on the Limewire software for all files secured through Limewire to be

shared.  N.T. 1/12/10, p. 88.

The Piaseckis utilized a computer technician named Chris Lewis to set up the computer

system in the Piasecki household.  Mr. Lewis built the computer that was in Jason Piasecki's

bedroom.  He installed Limewire on Jason's computer, on Mr. Piasecki's laptop and established a

network for the computers to share the hard drive in Jason's computer.  N.T. 1/12/10, p. 87-88.

Mr. Lewis attempted to show Jason how to delete the files he secured to the Limewire

program but Jason was unable to follow his instructions.  N.T. 1/13/10.g. 3-4.  The computer system

was originally installed in December 2005.  N.T. 1/13/10, p. 9.  Sometime thereafter, Jason had filled

up the original hard drive with pornography.  Because Jason was unable to delete files, Mr. Lewis

simply added another hard drive to the computer.  N.T. 1/12/10, p. 89-90.

After Detective Cummins discovered that there was child pornography on the computer in

the Piasecki household, he cooperated with Detective Haines of the Upper Makefield Township

Police Department (the Piasecki's home was located in Upper Makefield Township) and secured a

search warrant for computers and any other evidence related to pedophile or child pornography.  On

April 1, 2009 Detective Cummins, Detective Haines and two uniformed patrol officers from Upper

Makefield Township appeared at the Piasecki house at approximately 6:20 p.m.  A fifth police

officer was out in the street serving as backup.  Detective Cummins knocked on the door.  N.T.

1/11/10, p. 118.

Jason Piasecki answered the door.  _Id_., p. 101.

Detective Cummins was standing next to Detective Haines.  The two uniform patrol officers

were standing behind the two detectives.  _Id_., p. 119.  Thereafter Detective Cummins introduced

himself and Detective Haines to Jason and stated that they wanted to talk to Jason about "computer usage within the house". Id., p. 101. Detective Cummins said that he asked if he could speak to him two to three times while at the door before Jason said "yes". *Id*.

Detective Cummins asked if the police officers could come in to the home and Jason answered affirmatively. *Id*.,.p. 120. The exterior door is on the downstairs level, and is what Detective Cummins referred to as the basement and the living area of the Piasecki home is on the second floor. *Id*.

While at the door, Detective Cummins asked if anyone else was at home and Jason said that his son was upstairs. *Id*., p. 119. The two detectives and two uniformed Officers then followed Jason upstairs into the living area of the home. *Id*., p. 121.

In the living room, was an L shaped couch. Detective Cummins sat on one end of the couch, Jason sat in the middle and Detective Haines sat on the other end. *Id*., p. 102.

Detective Cummins and Detective Haines both testified that shortly after sitting down Detective Cummins told Jason that he did not have to speak to the officers and that he did not have to answer any questions.[1]  *Id*, 117, 147.  They testified that Detective Cummins said this after all 4 police officers were standing in the upstairs living room of the of the Piasecki house, and while Jason was seated on a couch between the two detectives. Detective Cummins testified that he did not tell Jason that he (Jason) did not have to let the officers come into the house at any time and that he did not tell Jason that he did not have to speak to them until the officers were upstairs in the livingroom. *Id*, pg. 120-121, 124.

The two detectives interviewed Jason for approximately one hour and twenty minutes before disclosing that they had a search warrant. Id, pg. 113. Early in the interview, Jason's seven year old son, Cory, came into the living room area "a couple of times". Then one of the uniformed police officers suggested that he "take Cory" into another room to play Xbox. *Id*, pg. 111. The other

---

[1]Detective Cummins and Detective Haines have a total of over thirty-five (35) years of police experience. N.T. 1/11/10, 8, 1/12/10, 46. They have received extensive training in conducting investigations and the necessity to write accurate reports on all important aspects of an interview. *Id.*, 115-116, 147. Neither detective noted in their separate reports that Detective Cummins had told Mr. Piasecki that he did not have to speak to them. N.T. pg. 117, 148,139.

uniformed officer stayed in the doorway between the living room, in which Jason was being interviewed and the den, two rooms away, in which the other police officer was with Cory. *Id.*, p. 122-123. Thus, the interview took place with Jason seated on a couch between two detectives, a uniformed police officer of 7-year-old Cory, and a uniformed police officer stood in the door of the room separating Jason from Cory.

During the interview, Jason repeatedly told the two detectives that he had not intentionally downloaded child pornography. *Id*, 106, 126-127, 130, 135, 136. He acknowledged however, that he downloaded adult pornography. *Id.* 157. Jason told the detectives that downloading video files took "hours" on his computer and he would just leave the computer on while downloading, and leave the room. *Id.*,135.

During the interview, Mr. Piasecki repeatedly and consistently told the detectives that he had not searched for child pornography and that if any videos of child pornography were on his computer, he had acquired them accidentally. *Id*, pg. 127. During the interview, Detective Cummins showed Mr. Piasecki a photograph of a child, clothed, taken from one of the videos on the Piasecki computer. He asked Mr. Piasecki if he had ever seen that child and he said that he "might" have seen her. *Id.*, 132. [2] Mr. Piasecki was asked if he had ever seen any images of children and he said that there might have been one time when he opened a file and saw a child. When pressed by the officers, he said that there might have been a few times and ultimately said that he may have seen a child twenty to thirty times on his computer. *Id*, 106-107, 133.

During this interview, Mr. Piasecki also said (inaccurately as it turns out) that he had installed the Limewire software on his computer. Jason never said that he saw child pornography, he told the officers that he was not "into" child pornography. *Id.*, p.132. He told them that whenever he saw something that he was not interested in he would "click to the end". *Id.*

Jason during the interview told the detectives that he did not want to lose his son, Cory. N.T. 1/12/10, p. 126. He also told the officers that if there was any child pornography on his computer they were free to delete it. At one point, when the officers were insisting that there was child

_____

[2] Since the child was clothed and not engaged in a sex act in the photo, we fail to understand how this equivocal answer contributes to the Court's verdict, but it was mentioned in the Court's opinion, so we include it here. Trial Court Opinion, p.5.

pornography on his computer, Jason asked if they could "squash" or "quash" this. *Id*, pg. 110.  The detectives told Jason that all they could do is put in their report if he was being cooperative, and they told him that they did not think he was being truthful.  *Id*, p. 126-127.  At no time did Mr. Piasecki refuse to answer any questions.

After approximately one hour and twenty minutes of this interrogation, Mr. Piasecki got a call on his cell phone. He answered it and it was Joseph Piasecki. The detectives could hear Jason tell his father that the police were at the home, and that they were questioning him about "downloading child pornography". *Id*, pg. 112, 128. The detectives could hear the caller (Joseph Piasecki) ask "well, did you?" and Jason responded "no". *Id*. Mr. Piasecki told Jason to stop talking to the police and that he would be home in "four minutes". *Id*.

Jason, at that point, said to the detectives that that was his dad, and that "he does not want me talking to you." *Id*.

Despite his fathers warning, Jason then offered to show the detectives the computers in the home, however, the detectives at that time told Jason that they had a search warrant. *Id*., p. 113.

Eventually the computers were analyzed by Special Agent Brian Coleman, a forensic computer technician from the Pennsylvania Attorney General's Office. Agent Coleman found 93 videos of "apparent child pornography" located on the two hard drives associated with Jason Piasecki's computer. N.T. 1/12/10 p. 50. [3]Of those 93 videos, Agent Coleman testified that there were "18 preview files". Of those 18 preview files, 10 had been downloaded to completion. *Id*, p. 55.

A preview file is a separate video file that is created when a preview function on the Limewire software is utilized. *Id*, p. 54. A preview file can only be created when the actual video is already in the process of being downloaded. *Id*., p. 62. Jason had told the officers, in his interview, that he would conduct a search for adult pornography and the computer would then download video files for hours. He told them that he would leave the room while the computer downloaded video files. *Id*., p. 135.

---

[3]"Apparent" child pornography means that the age of the children/victims in the videos is readily apparent to lay person. N.T. 1/12/10, p. 49-50. Defense counsel stipulated that the 93 videos constituted child pornography.

10

Agent Coleman testified that he found "several thousand" videos of adult porn on Jason's two (2) hard drives. *Id.*, p. 58-59. The 93 video files of child pornography were not segregated from the thousands of files of adult pornography, all the video files were located in the same folders. N.T. p. 61.

Both Agent Coleman and Chris Lewis, the Piasecki's computer technician who had set up their computer system, testified that multiple preview files could be created at the same time, and that only one video would be playing at any one time. *Id.*, p. 65. Thus, if, pornographic videos were being downloaded onto a computer, and the computer operator chose to preview six or eight files, only one video would be playing at one time. But five or seven other non-viewed files would be created, would be in a queue,  and would be marked as "preview files". *Id.*, p. 66, 70. Agent Coleman testified that the fact that preview files were created did not necessarily mean that the files were viewed at all, and moreover, it did not demonstrate that any file had been viewed for any particular length of time. *Id.*, p. 72.

At the conclusion of the Commonwealth's case, the Trial Court sustained a demurrer to the charge of disseminating child pornography, counts 1 through 15 of the criminal information. N.T. 1/12/10, p. 86.

At the conclusion of the Trial, Judge Boylan found Jason guilty of 15 counts of Possession of Child Pornography.  (Counts 16 through 30).

Sentencing was deferred to conduct an evaluation as to whether Jason was sexually violent predator under Megan's Law. N.T. 1/13/10, p. 83. (He was found not to a sexually violent predator. Trial Court Opinion, p. 1).

At his sentencing, Jason was sentenced to three years probation subject to certain conditions, among which he must register as a sex offender under Megan's Law.

## VI.   SUMMARY OF ARGUMENT

The Trial Court erred in failing to grant the motion to suppress defendant's statements to Detectives Haines and Cummins. Neither detective advised defendant of his Miranda Rights prior to interrogating him. At most, Detective Cummins told Jason that he did not have to speak to them. This was while four police officers were in the upstairs of the home. The circumstances of the interview certainly created a "police-dominated atmosphere". Jason suffers from severe cognitive deficits. One of the uniformed police officers took "custody" of Jason's 7-year-old son in another room. The remaining uniformed police officer stood in the doorway between Jason and his son. Jason then was positioned between the two detectives who interrogated him for approximately one hour and twenty minutes.

Despite the fact that Jason told the police repeatedly and consistently that he did not search for child pornography, the police unplugged the computer and the router, both of which contained search history information which was erased when the computer was unplugged. There are simple "live acquisition" technologies available that would allow a police officer, with some forensic training, to acquire and preserve this data which would have been favorable to Mr. Piasecki. This would have confirmed Mr. Piasecki's version that he did not search for child pornography.

Finally, there was not sufficient evidence to convict Mr. Piasecki of knowing possession of child pornography under these circumstances. Using Limewire software, Jason assuming that Jason viewed a video of child pornography, he would then have to go through a laborious process in order to delete it. The undisputed testimony is that Jason did not know how to delete files acquired with Limewire software. In fact, a computer technician tried to teach him this procedure, unsuccessfully. Accordingly, the technician simply added memory to Jason's computer when he filled up the hard drive with videos.

All of the evidence is consistent with Jason's version that the 93 videos of child pornography on his computer were accidently downloaded along with several thousand videos of adult pornography, and there is no evidence that Jason searched for or purposely acquired, viewed or possessed child pornography. The evidence was thus insufficient to convict Mr. Piasecki of knowing possession of child pornography.

## VII.   ARGUMENT

A.   **The non-Mirandized interrogation of Jason in the police dominated atmosphere when four police officers were present in his home, one of whom took his seven year old son into another room during the interrogation by two detectives, was custodial interrogation, and the inculpatory statements made by Jason, a person with severe cognitive disabilities, should have been suppressed by the Trial Court.**

Since 1966 it has been the established law of the United States that the Fifth Amendment privilege against self incrimination prohibits the admission into evidence of statements given by a suspect during "custodial interrogation" unless the so called Miranda warnings have been given by the police. Miranda v. Arizona, 384 U.S. 436 (1966). The Miranda Court itself recognized that a variety of circumstances, short of a formal arrest, could make a suspect believe that he was in custody, and held that the warning mandated by the Miranda decision applied to interrogation of individuals in a "police-dominated atmosphere." Id at 445.

Pennsylvania Courts have consistently recognized that the test for determining whether a suspect is being subjected to custodial interrogation so as to trigger the Miranda warnings is when a suspect is in a situation in which he can reasonably believe that his freedom is restricted. See, e.g. Commonwealth v. Reed, 583 A.2d 459, 462-463 (Pa. Superior Court 1990). Citations omitted.

Custodial interrogation does not depend on the subjective intent of the officers, rather the test focuses on whether the individual being interrogated reasonably believes his freedom of action is restricted Commonwealth v. Williams, 650 A.2d 420, 427 (Pa. 1994) citations omitted. The facts are evaluated in a case-by-case basis, and ultimately the issue depends upon the totality of the circumstances. Commonwealth v. Mannion, 725 A.2d 196, 200-202 (Pa. Superior Court 1999). In evaluating the totality of the circumstances, due consideration must be given to the "reasonable impression conveyed to the person interrogated". Mannion, supra, 725 A.2d. at 200, citing Commonwealth v Gwynn, 723 A. 2d 143, 148 (Pa. 1998).

In this case, the police did not tell Jason that he was not under arrest, nor did they tell him that he was free to terminate the interrogation at any time, that he was free to leave, or that he was free not to admit them to the house. His vehicle was blocked in the driveway by police vehicles.

His son was present in the home and, when the son came in to see Jason a second time, one of the uniformed patrol officers "helpfully" took the son into another room.

This Court has held under a variety of circumstances less "custodial" then those involved in this case, that Miranda warnings were required and that statements were subject to suppression when secured without the required Miranda warnings.

A single question of a motorist, after he was told he was free to leave has been found to be "custodial" for Miranda purposes. Commonwealth v Moyer, 954 A. 2d. 659 (Pa. Superior Ct. 2008).

In Moyer, following a car stop, two police officers issued a warning to the motorist/defendant who was then given his documents back and told that he was free to leave. As the motorist reach the driver's door of his vehicle, one of the officers called his name and asked if he minded if the officer asked him a few questions. The motorist agreed, the officer told motorist that he was aware of a prior drug arrest of the motorist, and told the motorist that he had observed furtive movements in the car after the traffic stop. He then asked if there were any drugs or paraphernalia in the car. The defendant responded negatively. The officer asked if he could check the vehicle to make sure that that was the case and the defendant, who was not told that he could refuse that request, consented to the search of his person and vehicle. Moyer, supra, 954 A. 2d. at 662. Drug paraphernalia was discovered on both defendant's person and in the car and defendant then admitted that he had recently smoked crack cocaine. Defendant was given his Miranda warnings for the first time as he was being booked for his DUI and drug charges.

Much of the Court's analysis in Moyer is devoted to the law applicable to automobile stops. Nonetheless, the Court ultimately analyzed the case on the basis of the "coercive features" and the "coercive environment" involved in the interrogation. Moyer, supra 954 A.2d at 666-668. The brief "interrogation" occurred after a traffic stop, there were two armed uniform police standing near defendant who was alone and isolated when he was asked if he would answer their questions. The defendant was not informed that he did not have to answer any further questions. One of the officers informed the defendant of the results of his criminal history check which disclosed prior drug activity. After this, the defendant was asked if there were controlled substances in his car. Id.

Importantly, in Moyer, while the defendant was not told that he did not have to answer any further questions, the questioning took place within seconds of defendant being told that he was free

14

to leave. Defendant had the keys to his car in his hand, was about to enter his vehicle and was perfectly free to drive away.

Of course, in this case, the police had blocked Jason's car in his driveway, the police never told him that he was "free to leave", and, in fact, for most of the interview, the police literally had "custody" of his 7-year-old son. N.T.1/11/10, p.123. A unformed police officer was standing in the doorway between the room where his son was in the custody of another police officer, and where the defendant was being interrogated by two detectives, who sat on either side of him.

These facts, we submit, make the environment in which Jason was interrogated much more coercive and much more "police-dominated" than the brief questioning out in the open presented in Moyer.

This Court has held that an interview of an employee at her place of employment, a school, after the employee twice signed an acknowledgment that she was not under arrest and that she was free to leave, constituted custodial interrogation. Commonwealth v. McCarthy, 820 A.2d 757 (Pa. Superior Court 2003).

In McCarthy, a school principal learned of thefts of a credit card, currency and prescription medications from a school office. A police officer conducted interviews at the school of staff members who had access to the office. The defendant signed a statement, prior to being interviewed acknowledging "that I am not under arrest. I fully understand that I am free to leave." McCarthy, Supra, 820 A.2d at 758.

After performing the initial series of interviews and collecting handwriting examples from the staff members, the investigating officer suspected that defendant's handwriting was similar to that on one of the credit card receipts for the stolen credit card. He returned to the school for a second interview with Defendant. The officer was in plain clothes and not in police uniform. He again read defendant the same notification as cited above, and defendant signed it again. The officer then proceeded to inform the defendant that he suspected her involvement in the thefts and advised her that she should cooperate. She then admitted to one theft, and after being warned that it would be unwise to stop cooperating, she ultimately admitted to three thefts. McCarthy, Supra 820 A.2d at 758-759.

The Trial Court suppressed the incriminating statements.

15

The Superior Court affirmed.  The Superior Court noted that in the second interview, the officer had told Defendant that she was a suspect, and that he was confident that the handwriting analysis would establish that she was the one who had illegally used the credit card.  The officer admitted that his purpose in returning was to try to get Defendant to confess and that the interview took place in an office with the door closed.  Defendant at one point wanted to speak to her husband or to an attorney.  The officer told her that if she "walked through that door he would make sure that all the charges stuck and that he would embarrass me in from of my friends."  The Superior Court held that that the basic test in "custodial interrogation" cases is whether the interviewee is being deprived of her physical freedom in a significant way, or whether she is placed in a situation in which she reasonably believes her freedom of action is restricted by the interrogation.  McCarthy, supra, 820 A.2d at 759-760, citations omitted.

The standard is an objective one, however, giving due consideration to the reasonable impression conveyed to the person being interrogated. Id., citing, Commonwealth v. Edmiston, 634 A.2d 1078 (Pa. 1993). A person is considered to be in custody for the purposes of Miranda warnings when the officer's show of authority leads the person to believe that she was not free to decline the officer's request, or to otherwise terminate the encounter.  McCarthy, supra, citing Commonwealth v. Whitherspoon, 756 A.2d 677 (Pa Superior Court 2000). (emphasis supplied).

The Superior Court in McCarthy concluded that "the circumstances of the confession, viewed in their entirety, indicate that it was not freely and voluntarily given." Id. Accordingly, the Superior Court affirmed the Order of the Trial Court suppressing the statement.

In McCarthy, there are important distinctions which make the circumstances of this case even more custodial in nature than those in McCarthy.  In this case, defendant had a total of four police officers in his home for the interrogation.  His vehicle was blocked in the driveway and, of course, his son was present as well.  In McCarthy, the interrogation was conducted at defendant's workplace by a single non-uniformed police officer.

As in McCarthy, the police interviewed Jason solely to elicit inculpatory information.  The police kept their search warrant in their pocket while they interviewed a mentally impaired person for well over an hour.  The only purpose of interviewing Jason, rather than simply executing their search warrant, was to secure inculpatory statements.  This is similar to McCarthy when the officer

16

went back for a <u>second</u> interview, after comparing handwriting samples and concluding that the defendant's handwriting matched the questioned sample. In fact, in this case the police had far <u>more</u> reason to suspect the interviewee than did the officer in <u>McCarthy</u>. Here, the detectives already had probable cause, rather than the mere suspicion of the officer in <u>McCarthy</u>. Here, the detectives had enough evidence to secure a search warrant. Again, Appellant submits that the totality of the circumstances in this case were far more coercive then those presented in <u>McCarthy</u>, given such circumstances as the location, the number of officers present, the pointed nature of the questioning, the blocked car in the driveway and the uniformed baby-sitting service.

This Court has held that a custodial interrogation takes place under certain circumstances when an individual is simply interviewed on the street by police. In <u>Commonwealth v. Ingram</u>, 814 A.2d 264 (Pa. Superior Court 2002) police officer conducted a lawful <u>Terry</u>-stop and search of the defendant in connection with an investigation into a stolen car in Clariton, Pennsylvania. The officer who approached the defendant conducted a protective pat down search. The officer felt an object in the defendant's pocket which proved to be marijuana. On touching the object in the pocket, the officer asked the defendant "what is this?". The defendant responded and identified the object with a slang term for marijuana. <u>Ingram</u>, supra, 814 A.2d at 269.

The Trial Court had concluded that defendant's information was voluntarily provided to the officer and that the statement and resulting seizure was not illegal.

The evidence presented at the suppression hearing revealed that three police vehicles had arrived at Ingram's location. Two officers approached Defendant on the street and asked to speak to him regarding the theft of a vehicle. Appellant was informed that one of the officers would need to conduct a pat down prior to the discussion. The defendant complied.

The Superior Court held that under these circumstances, as a matter of law:

> Appellant could reasonably believe that his freedom of action was restricted. Accordingly, we find that for purposes of our analysis, Appellant was at that point within the custody of the police officers. <u>Ingram</u>, supra, 814 A.2d at 271.

17

Further, because the officer "should have known that his question was reasonably likely to elicit an incriminating response", he was obligated to give Defendant the Miranda warnings. Id. [4] In Ingram, the defendant had a very brief encounter with the police, on the open street, in which he was asked a single question. In this case, twp detectives interrogated Jason for well over an hour in a confined area in his home. Again, the lengthy, police-dominated environment during the interrogation of Jason were much more coercive than the brief encounter and single question involved in Ingram.

This Court had held that an interrogation in a defendant's own home, again under circumstances less "custodial" then those presented here, required Miranda warnings. Commonwealth v. Gonzalez, 979 A.2d 879 (2009). In Gonzales, two officers were looking for a tenant in an apartment complex. An officer asked defendant, who was standing in his doorway, if he knew the whereabouts of the man for whom the police were searching. The defendant allowed the officer to enter his room to discuss the matter further. The officer saw drug paraphernalia, including a razor, baggy and a calculator in defendant's apartment, and asked defendant if he had any cash or drugs. The defendant said that he did and he said there were drugs in a drawer and he retrieved other drugs from a closet. Gonzales, Supra, 979 A.2d at 883-884.

The Trial Court had refused to suppress the evidence on the basis that the interview with the police was a "mere encounter" and not a custodial interrogation. Gonzales, Supra, 979 at 884. The Superior Court agreed "with the Trial Court that the interaction here began as a mere encounter; we do not agree that it remained one." Gonzales, supra, 979 A.2d at 884-885, emphasis in original. This Court noted that the police officer was in the room following a "chance meeting" with the police and had produced the cash and drugs in his pocket as a "free and unconstrained choice." Gonzales, supra, 979 A.2d at 887. However, the Superior Court held that once the suspect revealed that he had

---

[4]Ultimately, the Court determined that the search could be sustained on the basis of "inevitable discovery" in that the police, during their pat down had also found a hand gun in defendant's waistband, and defendant did not have a license to carry the gun and was not permitted to carry gun due to a prior conviction. Thus, he would have been arrested for the firearm violations and the marijuana in his pocket would have been discovered when he was searched in connection with that arrest. Ingram, supra, 814 A.2d at 272.

cocaine and a large amount of cash, "the nature of the interaction between Appellant and police changed." *Id*.

The Superior Court held that "following that production Appellant was in the "functional equivalent" of an arrest. Gonzales, supra, 979 A.2d at 888. The Superior Court acknowledged that the officer's tone was conversational in nature, he did not threaten Appellant, did not draw his gun and never placed Appellant in handcuffs. He described that Appellant as "cooperative" and "polite". For these reasons, the Suppression Court had concluded that the interaction was not custodial in nature. The Superior Court disagreed.

The Superior Court held that the continued interrogation of Appellant after he produced the wad of cash and bag of crack cocaine from his pockets was custodial in nature. This Court noted that there were two officers in the room, one officer standing within four or five feet of Appellant while another officer "remained in the doorway". Importantly, the Superior Court noted that:

> Appellant was located in his residence, thereby leaving him with nowhere to go to terminate contact with the police. Most importantly, however, the continued questioning of Appellant represented subtle coercion that was designed to elicit a given response. Gonzales, supra 979 A.2d at 889. (emphasis supplied).

Again, this Court noted that "given the circumstances of this case, where Appellant was in his own room and therefore had nowhere to go, Appellant could reasonably believe that his freedom of action was restricted. Gonzales, supra 979 A.2d at 889.

Ultimately, the Superior court held that:

> ...where armed police stood within Appellant's apartment in close proximity to him, and the officer's pointed questions followed Appellant's production of contraband from his person, we believe the persistent questioning about the existence of more drugs occurred under conditions that were reasonably likely to illicit in incriminating response. Thus, the instant record supports the conclusion that Officer Fisher should have given Appellant Miranda warnings once

Appellant freely produced the cash and crack from his pocket.[5] Gonzales, supra 979 A.2d at 889.

In this case, the police were clearly asking Mr. Piasecki "pointed questions". They repeatedly asked him about child pornography on his computer, how the computer was set up, how Limewire worked. The police even showed Mr. Piasecki photographs of children from the child pornography discovered on his computer. There could be nothing more "pointed" than this interrogation which was specifically focused on child pornography, the offense for which they had already secured a search warrant.

As in Gonzales, Jason was in his home and literally had no place to go, particularly with his vehicle blocked in by the police vehicles and his son in the custody of a police officer. Unlike Gonzales, this encounter was hardly a "chance meeting" in which defendant invited the police in his home. In this case, the police were at the home precisely to search and seize evidence of child pornography. Detective Cummins asked to speak to Jason two or three times before Jason admitted the police to the home.

In each of the cases cited above, the circumstances were much less "custodial" in nature than those presented here, simply based upon the circumstances and location of the interrogations.

However, there are two important factors that place this interrogation in a whole different legal universe than the cases cited above: (1) The fact that Jason had custody of his seven year old son who was taken into another room by a uniformed police officer; and (2) Jason has the intellectual capacity of a third grader.

To suggest that this interrogation was not custodial in nature is to suggest that Jason had the ability to snatch his son away from a uniformed police officer, leave the home and walk the streets of Washington Crossing in the evening hours of April 1. His car was blocked in by the police and obviously driving away was not an option. As this Court noted Gonzales, when the interrogation takes place in the suspect's home, the suspect has "nowhere to go" to end the interview.

---

[5]As in Ingram, the Superior Court ultimately upheld Mr. Gonzales conviction under the "inevitable discovery" doctrine. Gonzales, supra, 979 A.2d at 890-891.

There is virtually no justification that the Commonwealth can articulate for <u>not</u> advising Jason of his <u>Miranda</u> warnings.  The interview took an hour and twenty minutes.  A <u>Miranda</u> warning advisement would probably take less than 60 seconds.  In the absence of any logistical reason for not providing Jason with his <u>Miranda</u> warnings, the only remaining reason is that the police did not <u>want</u> to tell Jason that he could terminate the interview at any time, that he had the right to an attorney, and that anything he said could be used against him.  The police did not want to tell Jason about these rights precisely because he might exercise them.

Of course, in addition to the fact that Jason's son was in a separate room in the custody and control of a uniformed police officer, Jason himself is functioning at a third grade level intellectually. As this Court has noted, the standard for determining whether an encounter with the police is "custodial" is an objective one, based on the totality of the circumstances and giving "due consideration" to "the reasonable impression conveyed to the person rather than the strictly subjective view of the officers or the person being seized." <u>McCarthy</u>, supra 820 A2d. At 759-760. A person is in custody when the officers' show of authority "leads the person to believe that she was not free to decline the officer's request, or otherwise terminate the encounter." Id.

In this case, "due consideration to the reasonable impression conveyed" to the subject has to include the fact that Jason Piasecki was no better equipped intellectually to decide how best to handle the detective's interrogation than was his 7-year-old son playing X-box in the den with one of the officers. That is a sad, but undeniable fact of this case.

Jason even told the police early, in the interview, that he had "ADHD". Of course, the police could not know the true extent of his mental deficiency, but they <u>did at a minimum</u> know that he had a learning disability.

Rather than spending a minute to make sure that this impaired individual was aware of his very basic constitutional rights, the two detectives simply proceeded with their interview, flashing the photographs of the children, explaining to the defendant the importance of his cooperation, telling Jason that child pornography had been found on his computer, telling him that they did not think he was being truthful and offering that they could write up their reports to note that he had been cooperative, if indeed he was.

21

Pathetically, during the interview Jason told the officers that he was most concerned about potentially losing custody of his son, a concern that the officers clearly exploited during the interview.

Despite the circumstances of coercion and the lengthy interrogation by two highly trained and experienced detectives, Jason consistently told the officers that he was interested only in adult pornography and had no intention of downloading child pornography.

The Appellant believes that the detectives' conduct in this case was way beyond the pale of even arguably constitutionally permissible interrogation. There is simply no legitimate reason, consistent with Miranda, for not advising Jason of his basic constitutional rights. Similarly, upon discovering that Jason was alone with his son, there is no legitimate excuse for not providing him with an opportunity to make a telephone call to arrange for a babysitter before the interrogation took place, or simply delaying the interview until some other time.

Of course, the police were not interested in affording Mr. Piasecki with any of these opportunities. The police were intent on securing inculpatory statements, and then executing their search warrant. That is exactly what they did.

Appellant respectfully submits that this Court's decisions concerning custodial interrogation overwhelmingly support the position that the interview of Jason Piasecki on April 1, 2009 at the Piasecki home was a custodial interrogation, that the officers were constitutionally required to advise him of his so called Miranda warnings before interviewing him, and failed to do so. The statements should have been suppressed and it was error on the part of the Trial Court not to suppress Jason's statements.

B.      The police unplugged defendant's computer knowing that it would erase the search history information, immediately after Jason Piasecki had repeatedly told the police that he did not search for child pornography on his computer. The police action destroyed the search history information which would have been exculpatory to defendant.

Due process requires that evidence favorable to the accused should be made available to the accused for use at trial. Brady v. Maryland, 373 US 83 (1963). This Court has held that the necessary components to demonstrate a Brady violation are:

(1)     Evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching;

(2)     Evidence must have been suppressed by the Commonwealth, either wilfully or inadvertently;

(3)     Prejudice must have ensued. Commonwealth v. Causey, 833 A.2d 165 (Pa. Superior Court 2003).

A subset of Brady violation cases involves the destruction of evidence. In cases involving destruction of evidence by the Commonwealth, a relevant inquiry becomes whether the evidence was destroyed in bad faith. See, e.g., Commonwealth v. Moss, 689 A.2d 259 (Pa Superior Court 1997) (absent indication that State Police consciously destroyed blood sample in order to prevent discovery of exculpatory matter, suppression of the blood alcohol test results was not required by Commonwealths failure to preserve sample for independent analysis). Another inquiry with regard to destruction of evidence is whether the evidence that was destroyed is "material". See, e.g., Commonwealth v. Whaley, 434 A.2d 147 (Pa Superior Court 1981).

In Whaley, bed sheets involved in a rape case were lost by the police. At trial, police testified to stains that they had seen on the sheets, however, no chemical or other scientific analysis could be made. Whaley, supra, 434 A.2d at 148-149.

Defendant had sought dismissal of the charges on due process grounds, and also had sought suppression of any testimony or photographic evidence regarding the lost bed sheets. These motions were denied by the Trial Court.

The Superior Court ultimately held that the sheets were not "material" within the meaning of Brady and, therefore, there was not a denial of due process by the Commonwealth's loss of this evidence.

This Court held in Whaley that the standard for materiality was as follows:

> ... If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated on the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is not justification for a new

23

trial.  On the other hand, if the verdict is already of questionable

validity, additional evidence of relatively minor importance might be

sufficient to create a reasonable doubt.  Whaley, supra, 434 A.2d at

150, quoting United States v. Agurs, 427 US 97, 112-113 (1979).

In this case, both of the computer "experts", Chris Lewis and Agent Coleman, agreed that technology exists whereby the search history of the computer could be obtained through "live acquisition" procedures.  N.T. 1/11/10, pg. 86-88, 90-93.

Agent Coleman testified that to conduct a live search or live acquisition of the search history information  required special training of the officers conducting the search.  He testified that there were "only six agents in the entire state" in Pennsylvania who had such training, and accordingly, it was not practical to acquire the search history when computers are being seized.  The entire Limewire history of searches was erased when the computer was unplugged.  Id, pg. 77, 80, 86-89.

Both Mr. Lewis and Agent Coleman agreed that by unplugging the computer, most of the data on the computer is preserved.  The router contained relevant information regarding access routes, a listing of each computer connected to the router, it would show if another computer had hacked into the network.

In this case, the report from Agent Coleman showed that a large number of the child pornography files at issue had been accessed in some fashion at approximately 1:29 a.m. in the morning of April 1, 2009.  Detective Cummins stated that he had not done any searches of the Piasecki computers which would have changed the last access date. N.T. 1/11/10, p.39. Therefore, it was a complete mystery as to who or what had accessed the files, and whether the files themselves could have been created by, for example, a neighbor hacking into the Piasecki network.  All of this data, the search history and access data was destroyed by unplugging the router and computer.

As noted above, before the computer was unplugged, Jason repeatedly had told the detective that he had never searched for child pornography on his computer, that his searches were for adult pornography.  By unplugging the computer, the police erased the entire Limewire search history for his computer that would have confirmed (or refuted) this statement.

The information that was erased by unplugging the computer included the Limewire search history, that is, any terms that were used in searching on using Limewire software, Live acquisition

24

of data from the router would have also cleared up the mystery of who had signed onto the Piasecki computer network as "guest" in the early morning hours of April 1, 2009, and changed the "last accessed" date of half of the child pornography files.  N.T. 1/11/10, p.39-40.

There is no evidence in this record that the detectives knowingly wiped out exculpatory evidence.  However, in the context of Jason's claim that he had never searched for child pornography, Appellant submits that is was incumbent upon the Commonwealth to preserve potentially exculpatory evidence namely, the search terms that were used on the Limewire software.  Unfortunately, that data no longer exists because Detective Cummins "pulled the plug" on Jason's computer.

The fact that the detectives who were sent out to seize the computers at the Piasecki house did not have the appropriate training to properly preserve this evidence is really not an excuse.  The investigation had begun on March 12, 2009.  The Detective could have timed the search for when an agent with the requisite training to conduct a live acquisition was available.  Alternatively, of course, the Commonwealth could simply train the detectives in live acquisition that are sent out to seize computers.

To simply say that the agent was not properly trained to preserve this information is not a legitimate excuse for the destruction of exculpatory evidence.  It is incumbent upon the Commonwealth, if it intends to seize this evidence, to properly preserve it, even if that involves extra training or some additional logistical difficulties for the Commonwealth.

This general issue was considered by the Berks County Court of Pleas in Commonwealth v. Lamana, 7 Pa. D&C 5th 225 (Berks County 2009).  In Lamana, Mr. Lamana was a teacher at a high school.  The school district's IT manager (Ms. Volpi) was investigating a massive computer virus attack on the school district's computer network.  Mr. Lamana had installed his personal computer in his classroom and connected it to the school network.  Ms. Volpi found that Mr. Lamana's personal computer was the source of unusual traffic on the district's network.  After discovering that Mr. Lamana had pornography on his personal computer she ordered that he disconnect it from the district's network.  However, she gave him a short reprieve and allowed him to continue to utilize the district's network with his personal computer.

Shortly thereafter a virus again attacked district's network. Ms. Volpi decided to investigate Mr. Lamana's computer to see if it was the source of the virus. On November 29, 2004 she entered his classroom during a school holiday, turned on the computer and immediately found a folder labeled "shit". Inside the folder she found files with titles indicative of child pornography. She opened some of the files and found images of children participating in sex acts. She noted that these files has last been accessed on November 24, 2004. Later that day, she reopened some of the files to show the images to the school district's superintendent and to the police. Before Mr. Lamana could again access the computer, the police executed a warrant for its seizure.

Ms. Volpi's opening of the child pornography files became the basis for pre-trial motions. Each time the files were opened the data was altered to reflect the most recent use. When Ms. Volpi opened and viewed the child pornography files, she altered the access data (that is, the same data which mysteriously shows half of the child pornography video files being last accessed in the early morning hours of April 1, 2009). The data changed to reflect her most recent viewing, and erased the prior access data.

The defense alleged that this was potentially exculpatory evidence and moved for dismissal of the charges or preclusion of testimony concerning the contents of the computer. The Court denied the motions.

The Trial Court's discussion of this issue was relatively brief. The Court noted that Pennsylvania requires, in order to justify "corrective sanctions for lost or destroyed evidence", that the defendant demonstrate that the police acted in bad faith in losing or destroying the evidence, Commonwealth v. Small, 559 Pa. 423, 741 A.2d 666, 676 (Pa. 1999). The Court noted that the police did not commit the alleged destruction of the evidence and that Ms. Volpi was not attempting to obscure facts or alter data. Moreover, the evidence was lost to both parties and the defendant was able to "fully explore the loss of the data to suggest that the defendant was unaware of the contents of his computer." Lamana, Supra, 7 Pa. D&C 5th at 229.

In this case, unlike in Lamana, it was the police who wiped out the relevant data. Moreover, they did this at a time when they knew that the search history was relevant and important to the case.

We respectfully submit that, once the police were aware that the search history was relevant, and that the defendant claimed that he had never searched for child pornography, the failure to take

some steps to preserve that evidence amounts to bad faith.  Appellant submits that it is simply not sufficient to say that they were following their standard operating procedure in destroying exculpatory evidence.  Due process requires more, and the Trial Court erred in failing to grant the motion to dismiss under these circumstances.

> **C.    The evidence was insufficient to sustain a conviction for knowing possession of child pornography in the complete absence of any evidence that defendant searched for or intentionally acquired child pornography, the absence of any evidence that defendant filed purposefully viewed or separately maintained child pornography files, and, to the contrary, all of the evidence is consistent with defendants statement that he intended to acquire adult pornography, and the files of child pornography found on his hard drives were acquired accidentally through the Limewire file sharing software.**

Defendant was convicted of 15 Counts of Possession of Child Pornography as defined in 18 Pa. PS §6312 (d).  This offense is committed when :

> ... Any person knowingly possess or controls[6] any.. photograph, film, video tape, computer depiction or other material depicting a child under the age of 18 years, engaging in a prohibited sexual act or in the simulation of such act ....

At trial, counsel viewed a representative sampling of the "apparent child pornography" videos and entered into a stipulation with the Commonwealth that the videos identified as apparent child pornography were, in fact, child pornography.  The issue at trial was whether the defendant "knowingly possessed or controlled" the videos.

The well known standard for reviewing the sufficiency of the evidence is whether the evidence, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth, is sufficient to support all of the elements of the offenses beyond a reasonable doubt.  Commonwealth v. Wesley, 753 A.2d 204 (Pa. 2000).

The Supreme Court has considered the elements of this offense in a case in which other issues were raised on appeal in Commonwealth v. Diodoro, 970 A.2d 1/1/00 (Pa. 2009).  In Diodoro

---

[6] In 2009, the Legislature charged this offense to include any person who "intentionally views" child pornography.  Act 2009-15, §51.  This offense now defines "intentionally views" as a "deliberate, purposeful, voluntary viewing" of child pornography.

police seized the defendants personal computer from his residence in Delaware County. The forensic examination of the computer determined that it contained approximately 340 images of suspected child pornography and 30 images of known child pornography.

In Diodoro, all of the images were stored in the cache of the hard drive. Diodoro, supra, 970 A.2d at 1101. Given the large number of the images, the Commonwealth's expert witness testified that it world have taken an individual "a considerable amount of time" to scroll through the individual pictures. Id. The fact that the images were stored in the cache files indicated that someone had accessed the child pornography websites and by clicking the "next" button, or a specific image, had accessed and viewed the various images.

The parties stipulated as follows:

> ... The (30) unlawful images were viewed by (Appellant) on his computer while he was searching the World Wide Web for images of females underage (16).
> Diodoro, supra, 970 A2d.at 1101, (emphasis supplied).


Defendant in Diodoro was convicted at trial and appealed on the issue of whether the evidence was sufficient as to the elements of possession and control of the images, given that the images had not been downloaded, but were merely stored in the cache file by the operating system of the computer. Diodoro, supra, 970 A.2d at 1102.

Appellant argued that he did not possess or exercise control of the images by merely viewing them, and that any images that are viewed are "automatically" saved to an internet cache file. Id. The Appellant argued that the legislature did not make the mere viewing of child pornography via the internet illegal. Diodoro, supra, 970 A.2d at 1105 (see footnote 6 as the intentional viewing of child pornography is now included in this offense). Thus, the focus of the appeal in Diodoro was whether the defendant who intentionally searched for and viewed child pornography, but did not download the images, "possessed or controlled child" pornography.

The Supreme Court held that because §6312 did not include a definition of the term "control", the common usage and definition of the word governed. The definition applied by the

Supreme Court was "to exercise power or influence over". <u>Diodoro</u>, supra, 970 A.2d at 1107, citing

<u>Black's Law Dictionary</u>, 353 (8th addition 2004).  The Supreme court held that :

> ... An individual manifests such knowing control of child
> pornography when he <u>purposefully</u> searches it out on the
> internet and <u>intentionally</u> views it on his computer.  As the
> testimony in this case showed, in such a situation, the viewer
> has affirmatively clicked on images of child pornography
> from different web sites and the images are therefore
> <u>purposefully</u> on the computer screen before the viewer.  Such
> conduct is clearly exercising power and/or influence over the
> separate images of child pornography because the viewer
> may, interalia, manipulate, download, copy, print, save or
> email the images....It is clear that §6312 (d) should not and
> cannot be read to allow intentional and purposeful viewing
> of child pornography on the internet without consequence.
> <u>Diodoro</u>, supra, 970 A. 2d. at 1105-1106. (emphasis supplied)

> The Court supported this analysis with the following policy rationale:
> ...A contrary interpretation would be absurd and lead to
> unreasonable results - a gigantic loophole in the statute, never
> intended by the General Assembly, that would allow
> individuals to <u>intentionally</u> access and view child
> pornography via the internet with impunity, which would
> make the statute toothless.  <u>Diodoro</u>, supra, 970 A.2d at 1107.

In conclusion, the Court held that "accessing and viewing child pornography over the internet

constitutes "control" of such pornography under 18 Pa. CS §6312 (d)." Diodora, supra, 970 A. 2d.

at 1108.

In the case of Jason Piasecki, there is virtually no evidence that he intentionally, knowingly

or purposefully searched for, viewed or downloaded child pornography.  To the contrary, all of the

evidence supports Mr. Piasecki's contention that if child pornography on his computer, it was

obtained <u>accidentally</u> while he was intentionally downloading <u>adult</u> pornography.

As we know, the 93 videos of child pornography were mixed in with over 4,000 videos of adult pornography.  There was no segregation or filing of the child pornography.  There was no evidence whatsoever that Jason had the slightest interest in child pornography.

The Trial Court appeared to be under the misunderstanding that Jason had to highlight the child pornography video titles in order to download them.  The Trial Court, in its Opinion stated:

> Further, Defendant's argument that the files were part of a
> mass download of adult pornographic material is also
> unsupported as evidenced by the explicit and graphic nature
> of the titles of each file that Defendant highlighted before it
> was downloaded.  Trial Court Opinion, p. 20.

Agent Coleman had testified that hundreds or thousands of video files could be downloaded in one mass download  simply by clicking on "download."  N.T. 1/12/10, p. 63.  He also agreed that the computer screen would only show 20 or 25 titles of the video files being downloaded.  _Id_.  A person would have to scroll down on the computer to even see the <u>titles</u> of files being downloaded.  So the files' titles were not "highlighted" by Jason, and did not necessarily even appear on the computer screen to be downloaded.

Moreover, in this case the police found none of the evidence of pedophilia that they had sworn, in their probable cause affidavit, is "generally found" at locations of persons interested in child pornography.  In securing the search warrant, Detective Cummins had provided a list of the types of evidence that are "generally found" to exist and to be found in cases involving individuals who collect child pornography.  N.T. 1/12/10, p. 36-42.  See Exhibit D-1, 16&17.  Among these items, according to the <u>Commonwealth's</u> evidence of personal sexual encounters with children, child erotica, internet based vehicles such as emails, email groups, bulletin boards, news groups, instant messaging relating to child pornography.  The Commonwealth stipulated that none of this evidence was found by the police.  _Id_, p. 41.

Jason told the officers that the downloading process on his computer was extremely slow and would typically take hours when he was trying to secure adult pornography.  He told the officers that he would walk away from the computer while it was downloading pornography.  N.T. 1/11/10, p. 135.

The Commonwealth was even unsuccessful in proving that Jason knew that child pornography was on his computer. While he did admit in his statement that he had seen children (after significant prodding from the detectives) as many as twenty to thirty times, he never said that they were in pornographic videos or were performing sexual acts when he saw them. He said that if he ever saw a "video with a child on it, he would click to the end" of the video.

The Commonwealth attempted to show that "preview files" were actually previewed by someone. What the evidence actually demonstrated was that multiple preview files can be created at essentially the same time. Six to eight files can be designated to be previewed at a single time. Only one video will be shown on a computer screen at a time. All that the existence of a "preview file" demonstrates is that while it was being downloaded, it was placed in a queue of files to potentially be viewed. This is all that is necessary to create a preview file. The forensic testimony could not demonstrate that the file had actually been viewed by Jason or by anyone else. See testimony of Agent Coleman, 1/12/10, p.66, 72; testimony of Chris Lewis, *Id.* p.109.

Moreover, even the video that would be showing on the computer screen when preview files are created could be terminated immediately after it had started running. Thus, a preview file would not only not have to be seen at all, but even those videos which were viewed on the screen, could have been viewed for a few seconds, or not at all. Id., see also N.T. 1/13/10, p.47.

Agent Coleman attempted to demonstrate that the preview files were created too many "seconds" apart from other adult pornography files that were created in close proximity to the child pornography files to be part of a "mass download". See generally, N.T. 1/13/10, p.36-42. Because it only took a few seconds to download preview files in an "experiment" that he performed on the Attorney General's computer, he felt that it should only take a few seconds on the Piasecki computer. N.T.- 1/13/10, p.41-42. However, he admitted that he did not know how long it would take to have created these files on the Piasecki computer and he had only tried to do this "experiment" on the State Police laboratory computer. Id., p.43. He did not identify what files he tried to download, their complexity or the length of the files, and he admitted that he had no idea how long it would take the Piasecki computer to create separate preview files. Id., p.44, 47. In fact, Agent Coleman's testimony (and that of Chris Lewis, N.T. 1/13/10, p.17-18) is that the preview files of child pornography were generally created within seconds of other video preview files. *Id.*, p.44-46.

31

The Commonwealth's case is remarkable for what it does not prove. It does not prove that Jason Piasecki viewed any image or video of child pornography. It does not prove that any person viewed any image or video of child pornography on Jason Piasecki's computer. The Commonwealth did not show (and we believe does not argue) that Jason Piasecki intentionally searched for or downloaded child pornography. There was no evidence relating to pedophilia, child erotica, or the sexual exploitation of children found at the Piasecki home.

What the Commonwealth did find were 93 videos of child pornography mixed up inextricably with thousands and thousands of videos of adult pornography on the computer of a defendant functioning on the level of a third grader.

The Supreme Court in <u>Diodoro</u> made clear that intentional and purposeful viewing of child pornography on a computer is proscribed by §6312 (d). Indeed, the Legislature has now codified that ruling. Both the Supreme Court and the Legislature made it clear that the statute was intended to proscribe the "intentional viewing" of child pornography. That purpose is not served by convicting persons, such as Jason Piasecki, who unwittingly and unintentionally secure child pornography while searching for adult pornography.

Clearly, Jason Piasecki is not intellectually equipped to conduct a focused search for pornography (or for anything else) on the internet. His mother testified that he cannot spell. N.T. 1/11/10, p.182. He can barely help his second grade son sound out words in his school books. <u>Id</u>., p.182-183. He calls his mother to ask about spelling of simple words. <u>Id</u>. Virtually all of the names of friends and family members on his cell phone were misspelled. <u>Id</u>. It is hardly surprising that when he types in a simple pornographic search term, the search may be overly broad and he then secures unwanted material. This is not the person, or the conduct, which the legislature intended to outlaw in §6312 (d).

Even if Jason had viewed child pornography that had been accidentally secured, this viewing was entirely accidental and would not be proscribed even under the recent amendments to Section 6312, which outlaws "deliberate, purposeful, voluntary" viewing of child pornography.

Mr. Lewis tried to teach Jason how to delete video files, and was unable to do so. Deleting from the Limewire software is a multiple stage process that Jason was absolutely incapable of

mastering.  After Mr. Lewis was unsuccessful in showing Jason how to delete his video files, he simply added another hard drive to Jason's computer.

Thus, even if Jason was aware that child pornography was on his computer, he could not get rid of it.  The only possibility for deleting it would have been to secure the assistance of someone else, such as Mr. Lewis or Jason's father.[7]  The problem is that, under Diodoro, and the recent amendments to 6312 (d), a person viewing the child pornography would arguably be guilty of viewing or controlling it.  Moreover, deleting child pornography could well result in being charged with tampering with or fabricating physical evidence under 18 Pa. CS §4910 or concealing or destroying evidence of a crime under §5105 (a)(3), or aiding consummation of a crime under §5107.

In short, it is legally problematic, to say the least, for anyone else to view and delete child pornography from a computer-even someone else's computer.  Once the accidently-downloaded file exists on the hard drive, our current law does not provide for a legally-sanctioned way to have it removed.  Unable to delete the files, Jason could not practically or lawfully get the files off his computer.

The Commonwealth's evidence clearly showed that Jason's hard drive contained 93 videos of child pornography.  The Commonwealth did not show that these videos were intentionally obtained by Mr. Piasecki, or "knowingly" possessed or controlled by him, that he viewed them, or that he had any ability to get rid of them.  In fact, the weight of the undisputed evidence is that Jason did not search for or intentionally download child pornography.

For this reason, Appellant respectfully submits that the Commonwealth did not present sufficient evidence to sustain a verdict that defendant "knowingly possessed or controlled" the videos of child pornography.

---

[7] The Trial Court, during closing argument, suggested that Jason could "pay someone to delete things."  N.T. 1/13/10, p.69.

# VIII.   CONCLUSION

Wherefore, for the foregoing reasons, Appellant, Jason Piasecki, respectfully requests that this Honorable Court reverse and vacate the judgment of conviction entered below or in the alternative, vacate the judgment and remand this matter to the Court below prohibiting use of statements made by Jason Piasecki to the police, and grant such other and further relief as may be appropriate under the circumstances.

Respectfully submitted,

BEGLEY, CARLIN & MANDIO, LLP

By:_____

Douglas C. Maloney, Esquire
Attorney I.D. NO. 34388
Attorney for Cynthia H. Magill
P.O. Box 308
Langhorne, PA 19047
215-750-0110

34

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of Appellant's Brief was sent via first class mail to the following:

Karen Diaz, Esquire
Bucks County District Attorney's Office
55 East Court Street
Doylestown, PA 18901 (2 copies)

The Honorable Rea Boylan
Judges Chambers
Bucks County Courthouse
55 East Court Street
Doylestown, PA 18901 (1 copy)

DOUGLAS C. MALONEY, ESQUIRE

Dated: 1/18/11

# EXHIBIT E

J-A13032-11

ANNEX
#931

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JASON PIASECKI, | |
| Appellant | No. 1397 EDA 2010 |

Appeal from the Judgment of Sentence of April 26, 2010,
in the Court of Common Pleas of Bucks County,
Criminal Division at No. CP-09-CR-0005364-2009

BEFORE: OLSON, FREEDBERG and COLVILLE[*], JJ.

MEMORANDUM[**]:                                    **FILED JULY 25, 2011**

This case is a direct appeal from judgment of sentence. The issues are: (1) whether the evidence was sufficient to support Appellant's conviction under 18 Pa.C.S.A. § 6312(d)(1) (knowingly possessing child pornography)[1]; (2) whether the trial court erred in not granting Appellant's motion to dismiss the case due to the Commonwealth's destruction of evidence; and (3) whether the trial court erred in not granting Appellant's motion to suppress his statements to the police. We affirm the judgment of sentence.

_____

[*] Retired Senior Judge assigned to the Superior Court.
[**] BY: COLVILLE, J.
[1] This statute has been amended since the instant case arose.

J-A13032-11

Appellant faced various charges after police found child pornography on his computer.  He proceeded to trial, was convicted of possessing child pornography, was sentenced, and later filed this timely appeal.

In his sufficiency claim, Appellant does not contest the fact that there was child pornography on his computer.   Rather, he contends the Commonwealth did not prove he knowingly possessed that pornography.

With respect to issues of sufficiency of the evidence, we proceed as follows:

> When evaluating a sufficiency claim, our standard is whether, viewing all the evidence and reasonable inferences in the light most favorable to the Commonwealth, the factfinder reasonably could have determined that each element of the crime was established beyond a reasonable doubt.  This Court considers all the evidence admitted, without regard to any claim that some of the evidence was wrongly allowed.   We do not weigh the evidence or make credibility determinations.   Moreover, any doubts concerning a defendant's guilt were to be resolved by the factfinder unless the evidence was so weak and inconclusive that no probability of fact could be drawn from that evidence.

*Commonwealth v. King*, 990 A.2d 1172, 1178 (Pa. Super. 2010) (internal citations omitted).

The context of Appellant's sufficiency contention is that thousands of video files, perhaps over four thousand, were found on his computer.  Ninety-three contained child pornography and the rest, apparently, consisted of adult videos.  The evidence showed that many videos could have come to be in Appellant's computer during mass downloads of pornography.  Appellant's point is that the child pornography could have been accidentally

- 2 -

J-A13032-11

swept into his computer as he was downloading adult videos.  As such, he maintains, the evidence did not demonstrate knowing possession of the material involving children.

The Commonwealth presented evidence showing that there were preview files associated with the child pornography.  The significance of there being preview files is that such files tend to demonstrate that someone viewed the videos, or at least viewed some part of them, while they were being downloaded.  However, Appellant argues the evidence also showed that multiple preview files can be created simultaneously, with one video (perhaps an adult one) being viewed on the screen while others (perhaps child videos) do not appear.  On this point, the Commonwealth offered evidence tending to show that the preview files associated with the child pornography were likely created not at the same times as several of the adult preview files but, instead, hours or minutes apart from those adult preview files.  Evidence of the disparate times was intended to refute the notion that the child preview files were created unknowingly by Appellant while he was previewing adult videos.

Appellant then argues the Commonwealth may have proven that the preview files for the child pornography were created at times significantly different from some of the adult files, but the Commonwealth did not offer such proof with respect to all of the several thousand adult videos.  It appears Appellant is correct that the police did not compare the creation times of all the preview files.

- 3 -

J-A13032-11

When Appellant was interviewed by the police, he initially told them he never saw or downloaded child pornography. He then claimed he may have downloaded it accidentally but had deleted it as soon as he saw what it was. At one point, he told police he had seen child pornography once. Thereafter, he said that he may have done so a couple of times. Eventually, he indicated he had seen child pornography twenty or thirty times. While first claiming he immediately deleted any child pornography that he saw, he later told police that he would "click" to the end of such videos. N.T., 01/11/10, at 107.

An officer showed Appellant a picture of a prepubescent girl who evidently appeared in one of the videos. Appellant indicated he might have seen her image on the computer screen at some point. Also during the interview, Appellant asked if he would be arrested and, further, inquired as to whether "we can just make this go away" if any child videos were found on his computer and were then deleted. *Id.* at 111.

In view of Appellant's statements, including the conflicts therein, the fact that the child pornography was found on his computer, and the existence of the preview files, we cannot say that the evidence was so weak and inconclusive that no probability of guilt could arise therefrom. In reaching this conclusion, we stress that we are viewing the evidence in the light that is the most favorable to the Commonwealth, as we must do on sufficiency reviews. Appellant's sufficiency claim therefore fails.

- 4 -

J-A13032-11

Appellant's second issue is whether the court should have dismissed the charges against him because, by unplugging his computer without first shutting it down and/or performing certain operations on it, police lost or destroyed some or all of his Internet search terms. His point is that the search terms could have corroborated a statement he made to police in which he said that he had never searched for child pornography on the Internet. He argues that, because he made this statement before the seizure of the computer, it was incumbent on police to preserve the search terms before unplugging the computer and that their failure to do so constituted a due process violation warranting dismissal of the prosecution. He acknowledges there is no evidence that police intended to destroy evidence.

Due process does not require the dismissal of charges based on the destruction of potentially useful evidence unless the Commonwealth destroyed the evidence in bad faith. *Commonwealth v. Snyder*, 963 A.2d 396, 403-05 (Pa. 2009). When a trial court grants or denies a pretrial motion to dismiss a prosecution based on the destruction of evidence, we will not disturb the court's decision unless the court abused its discretion or committed an error of law. *Commonwealth v. Free*, 902 A.2d 565, 567 (Pa. Super. 2006). An abuse of discretion involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law, not merely an error in judgment. *Commonwealth v. Bradford*, 2 A.3d 628, 632-33, (Pa. Super. 2010).

- 5 -

J-A13032-11

In this case, the evidence in question was potentially useful to Appellant: if the search terms had been preserved, they may or may not have revealed whether Appellant had searched for child pornography and, if they revealed he had not conducted such searches, that particular revelation may or may not have affected the factfinder's ultimate determination of whether Appellant knowingly possessed the child pornography that was, in fact, on his computer.  Given the potential nature of the evidence, Appellant was required to show the Commonwealth, through the police, acted in bad faith.  The trial court found the police did not act in bad faith.  For the reasons that follow, Appellant has not persuaded us the trial court erred.

Testimony from a detective involved in seizing the computer and testimony from an agent of the Pennsylvania Attorney General's Office indicated police are generally trained that unplugging a computer without shutting it down and without performing any operations thereon is usually the best way to preserve the optimal amount of computer information for investigative purposes.  The detective in question was trained in this manner.  Apparently, his training came from the U.S. Department of Justice.

The suppression evidence indicated there are steps one can take before unplugging a computer that would preserve the type of information that seems to have been lost in this case, but the particular detective who seized the instant computer did not have the specialized training to do so.  Evidence also suggested that most police, likewise, do not receive such training, although a limited number of officers may have such heightened expertise.  Testimony further indicated that shutting down the computer or

- 6 -

J-A13032-11

otherwise attempting various operations on it could have resulted in an increased loss of data when compared to unplugging the machine.

Taking note of the foregoing facts, the court concluded the police in this case did not act in bad faith. The seizure protocol used in this case was, by design, intended to preserve an optimal amount of investigative data. The detective acted in light of the potential hazards of shutting down the computer and of attempting other operations thereon, and in light of there being a limited number of officers who might have had more sophisticated training relative to the preservation of computer data. In reaching its conclusion that the police had no bad faith, the court also observed that all evidence available for analysis by the Commonwealth was also available to the defense. This is not a case where the Commonwealth analyzed the search terms and then destroyed them; neither the Commonwealth nor Appellant made use of the search terms.

Having reviewed the record and the trial court's opinion, we are unconvinced the court's aforementioned decision was based on bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law. Seeing no abuse of discretion, we will not disturb the court's order.

In his next claim, Appellant argues the court should have granted his motion to suppress the statements he made to police when they interviewed him at his house. More precisely, he contends he was in custody during that interview and the police failed to administer him his rights under *Miranda v.*

- 7 -

J-A13032-11

*Arizona*, 384 U.S. 436 (1966).  The trial court determined the interview was not custodial.

> We recall the following law:
>
> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.
>
> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does **not** automatically trigger "custody," thus requiring *Miranda* warnings.

*Commonwealth   v.   Schwing*, 964 A.2d 8, 11-12 (Pa. Super. 2008) (emphasis in original).

We will not disturb a suppression order unless it is unsupported by the record or legally erroneous. *Id.* at 11.

Herein, the trial court found that police came to Appellant's home, asked him if he would discuss his computer usage and, after Appellant agreed to do so, entered his home with his permission.  The court also found

- 8 -

J-A13032-11

that, during the interview, Appellant was not restrained or coerced in any way and he took a phone call from his father. Although his father told him not to talk to the police, Appellant continued to do so. The entire interview occurred in Appellant's home; he was not transported to any other location. Based on the aforesaid findings, the court determined that, under the totality of the circumstances, the conditions of the interview were not so coercive as to constitute the functional equivalent of an arrest. Accordingly, the court reasoned that *Miranda* rights were not required.

The record supports the court's aforesaid factual findings, and we see no legal error in the court's conclusions that the interview was not custodial and that *Miranda* was inapplicable. Appellant was not physically deprived of his freedom in any significant way and was not placed in a situation where it was reasonable for him to believe his freedom of action or movement was restricted by the police questioning. We recognize Appellant's brief argues he is of very limited intelligence. Nevertheless, we find nothing in that argument persuading us that his limitations, whatever they might be, rendered the questioning by police a custodial interrogation. In short, we see no basis to disturb the trial court's ruling. Thus, Appellant's claim fails.

Judgment of sentence affirmed.

J-A13032-11

Judgment Entered.

Prothonotary

Date:_____

# EXHIBIT  F

# In The Supreme Court of Pennsylvania

COMMONWEALTH OF PENNSYLVANIA

                      Respondent      No.

      v.

**JASON PIASECKI**                       Allocatur Docket

                      Petitioner     _____(year)

---

## *PETITION FOR ALLOWANCE OF APPEAL OF JASON PIASECKI*

---

**APPEAL FROM THE JUDGMENT OF THE SUPERIOR COURT OF PENNSYLVANIA DATED JULY 25, 2011 AT DOCKET NUMBER 1397 EDA 2010 AFFIRMING THE JUDGMENT OF THE COURT OF COMMON PLEAS OF BUCKS COUNTY, DOCKET NUMBER CP-09-CR-0005364-2009 IMPOSING A JUDGMENT OF SENTENCE**

---

BEGLEY, CARLIN & MANDIO, LLP
Douglas C. Maloney, Esquire
Attorney I.D. #34388
680 Middletown Boulevard
P.O. Box 308
Langhorne, PA 19047
*Attorney for Appellant/Petitioner,*
*Outdoor Partnership, LLC*

## *Table of Contents*

I.     Order in Question . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.    Statement of Questions Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   Statement of the Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.    Reasons Relied on for Allowance of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## *Table of Authorities*

Commonwealth v. Diodoro, 970 A.2d 1100 (Pa. 2009) ............................... 10, 11

Commonwealth v. Williams, 650 A.2d 420, 427 (Pa. 1994) ............................ 13

Commonwealth v. Gwynn, 723 A.2d 143, 148 (Pa. 1998) .............................. 13

Miranda v. Arizona, 384 U.S. 436, 445 (1966) ........................................ 13

Commonwealth v. Gonzalez, 979 A.2d 879, 889 (Pa. Superior Ct. 2009) .................. 13

W:\DATA\Clients\02439\2090328Y\00512500.WPD
Apr 16 2013

## I.    ORDER IN QUESTION

Judgment of Sentence Affirmed.  Judgment Entered.

BY THE COURT:

_____

President Judge

## II.   STATEMENT OF QUESTIONS PRESENTED FOR REVIEW

1.   Did the Superior Court err in holding that the Trial Court had sufficient evidence to support Appellant's conviction for Possession of Child Pornography under 18 Pa.C.S.§6312(d)(1) where Petitioner, functioning at a third to fourth grade level of intellectual achievement, did not search for or intentionally acquire child pornography, where less than 100 videos of child pornography were mixed indiscriminately with over 4000 videos of adult pornography, and Petitioner was incapable of the deleting or removing any of the videos secured through the Limewire file sharing software program from his computer?

2.   Did the Superior Court err in holding that the Trial Court properly denied Petitioner's Motion to Suppress Statements made to the police where the undisputed evidence was that Defendant was interrogated by two detectives, in the company of two uniformed police officers in his home, while a uniformed police officer took custody of Defendant's seven year old son from his presence, and Defendant was not read the warnings required by *Miranda v. Arizona* for custodial interrogation?

### III.   STATEMENT OF THE CASE

#### A.   Procedural History.

Defendant was convicted of Possession of Child Pornography (18 Pa C.S. §6312 (d)(1) at a non-jury trial before Honorable Rea Boylan of the Bucks County Court of Common Pleas that concluded on January 14, 2010. On April 26, 2010, Appellant was sentenced to three (3) years probation. Appellant filed a timely notice of appeal. By Memorandum Opinion dated July 25, 2011, the Superior Court affirmed the judgment of sentence.

#### B.   Jason Piasecki

Jason Piasecki functions at a reading level equivalent to the third grade, and a math level equivalent to the second grade. N.T. 1/11/10, p.176. He receives Social Security Disability due to his mental impairment. *Id*. p. 178-179. (We will refer to Appellant as "Jason" to distinguish him from his father, Joseph Piasecki).

Jason lives at home with his parents, Marlene and Joseph Piasecki, and with his eight year old son, Cory.

Jason's son Cory was in the second grade at the time of trial. At this grade level, Jason was completely unable to help Cory with any math problems as Cory was "even with Jason in math ability". *Id*., pg. 182. Jason could, occasionally, help Cory with reading as he could sometimes sound out simple words that Cory still did not understand. *Id*., p. 183.

Unfortunately, Jason had virtually unlimited access to a personal computer with Limewire file sharing software. Jason also had a compulsive interest in adult pornography.

Jason cannot spell (*Id*., p. 182-193) and was unable to delete files that he secured through Limewire. N.T. 1/13/10, p. 3-5. For that reason, he had downloaded so many video files, that he filled up the hard drive in his P.C. When that happened the Piaseckis' computer consultant simply added more memory. *Id*. In short, Jason was incapable of performing a focused internet search, and even if he knew it had been downloaded he was incapable of deleting illegal child pornography from his computer.

Jason was home at his parents' house with his son, Cory, on April 1, 2009 when two plain clothes detectives and two uniformed police officers pulled up to the house, blocked his car in the driveway and knocked on the door. Another uniformed officer was in his patrol car in the street. His, parents, Joseph and Marlene, were not at home.

C.    **Police Investigation**

One of the plain clothes detectives, Jeff Cummins of the New Britian Township Police Department was a member of a police unit called the "Internet Crimes Against Children Task Force". *Id*., p. 8.

Using police software, Detective Cummins had determined that videos of child pornography were located on a computer at the Piasecki household. *Id*., p. 9-12. The computer itself was registered to Marlene Piasecki and at the Piasecki's home at 110 Overlook Avenue, Washington Crossing, Pa. *Id*., p. 20.

After Detective Cummins discovered that there was child pornography on the computer in the Piasecki household, he cooperated with Detective Haines of the Upper Makefield Township Police Department (the Piasecki's home was located in Upper Makefield Township) and secured a search warrant for computers and any other evidence related to pedophile or child pornography. On April 1, 2009 Detective Cummins, Detective Haines and two uniformed patrol officers from Upper Makefield Township appeared at the Piasecki house at approximately 6:20 p.m. A fifth police officer was out in the street serving as backup. Detective Cummins knocked on the door. N.T. 1/11/10, p. 118.

Jason Piasecki answered the door. *Id*., p. 101.

Detective Cummins asked if the police officers could come in to the home and Jason answered affirmatively. *Id*., p. 120. The exterior door is on the downstairs level, and is what Detective Cummins referred to as the basement and the living area of the Piasecki home is on the second floor. *Id*.

Detective Cummins and Detective Haines both testified that shortly after sitting down Detective Cummins told Jason that he did not have to speak to the officers and that he did not have to answer any questions.[1] *Id*., 117, 147. They testified that Detective Cummins said this after all 4 police officers were standing in the upstairs living room of the of the Piasecki house, and while Jason was seated on a couch between the two detectives. Detective Cummins testified that he did

---

[1]Detective Cummins and Detective Haines have a total of over thirty-five (35) years of police experience. N.T. 1/11/10, 8, 1/12/10, 46. They have received extensive training in conducting investigations and the necessity to write accurate reports on all important aspects of an interview. *Id.*, 115-116, 147. Oddly, detective noted in their separate reports that Detective Cummins had told Mr. Piasecki that he did not have to speak to them. N.T. pg. 117, 148,139.

not tell Jason that he (Jason) did not have to let the officers come into the house at any time and that he did not tell Jason that he did not have to speak to them until the officers were upstairs in the livingroom. *Id*., pg. 120-121, 124.

The two detectives interviewed Jason for approximately one hour and twenty minutes before disclosing that they had a search warrant. *Id*., pg. 113. Early in the interview, Jason's seven year old son, Cory, came into the living room area "a couple of times". Then one of the uniformed police officers suggested that he "take Cory" into another room to play Xbox. *Id*., pg. 111. The other uniformed officer stayed in the doorway between the living room, in which Jason was being interviewed and the den, two rooms away, in which the other police officer was with Cory. *Id*., p. 122-123. Thus, the interview took place with Jason seated on a couch between two detectives, a uniformed police officer of 7-year-old Cory, and a uniformed police officer stood in the door of the room separating Jason from Cory.

During the interview, Jason repeatedly told the two detectives that he had not intentionally downloaded child pornography. *Id*., 106, 126-127, 130, 135, 136. He acknowledged however, that he downloaded adult pornography. *Id*., 157. Jason told the detectives that downloading video files took "hours" on his computer and he would just leave the computer on while downloading, and leave the room. *Id*.,135.

Jason repeatedly and consistently told the detectives that he had not searched for child pornography and that if any videos of child pornography were on his computer, he had acquired them accidentally. *Id*., pg. 127. Mr. Piasecki was asked if he had ever seen any images of children on his computer and he said that there might have been one time when he opened a video file and saw a child. When pressed by the officers, he said that there might have been a few times and ultimately said that he may have seen a child twenty to thirty times on his computer. *Id*., 106-107, 133.

Jason never said that he saw child pornography, and he told the officers that he was not "into" child pornography. *Id*., p.132.[2]  He told them that whenever he saw something that he was not interested in he would "click to the end". *Id*.

---

[2]The search warrant application had listed a wide range of evidence that are "generally found" in cases involving persons who collect child pornography. N.T. 1/12/10, p. 37, *Exhibit D-1*, p. 16-17. Other than the videos themselves no other evidence of the type "generally found" in searches of child pornography was found in this case. *Id*, p.42.

After approximately one hour and twenty minutes of this interrogation, Mr. Piasecki got a call on his cell phone. He answered it and it was Joseph Piasecki. The detectives could hear Jason tell his father that the police were at the home, and that they were questioning him about "downloading child pornography". _Id_., pg. 112, 128. The detectives could hear the caller (Joseph Piasecki) ask "well, did you?" and Jason responded "no". _Id_. Mr. Piasecki told Jason to stop talking to the police and that he would be home in "four minutes". _Id_.

Despite his father's warning, Jason then offered to show the detectives the computers in the home, however, the detectives at that time told Jason that they had a search warrant. _Id_., p. 113.

Eventually the computers were analyzed by Special Agent Brian Coleman, a forensic computer technician from the Pennsylvania Attorney General's Office. Agent Coleman found 93 videos of "apparent child pornography" located on the two hard drives associated with Jason Piasecki's computer. N.T. 1/12/10 p. 50. [3]Of those 93 videos, Agent Coleman testified that there were "18 preview files". Of those 18 preview files, 10 had been downloaded to completion. _Id_., p. 55.

Agent Coleman testified that he found "several thousand" videos of adult porn on Jason's two (2) hard drives. _Id_., p. 58-59. The 93 video files of child pornography were not segregated from the thousands of files of adult pornography, all the video files were located in the same folders. N.T. p. 61.

At the conclusion of the Commonwealth's case, the Trial Court sustained a demurrer to the charge of disseminating child pornography, counts 1 through 15 of the criminal information. N.T. 1/12/10, p. 86.

At the conclusion of the trial, Judge Boylan found Jason guilty of 15 counts of Possession of Child Pornography. (Counts 16 through 30).

Sentencing was deferred to conduct an evaluation as to whether Jason was sexually violent predator under Megan's Law. N.T. 1/13/10, p. 83. (He was found not to be a sexually violent predator. Trial Court Opinion, p. 1).

At his sentencing, Jason was sentenced to three years probation subject to certain conditions, among which he must register as a sex offender under Megan's Law.

---

[3]"Apparent" child pornography means that the age of the children/victims in the videos is readily apparent to lay person. N.T. 1/12/10, p. 49-50. Defense counsel stipulated that the 93 videos constituted child pornography.

IV.  **REASONS RELIED ON FOR ALLOWANCE OF APPEAL**

1.  The Superior Court's decision was not in accord with this Court's ruling in <u>Commonwealth v. Diodoro</u>, 970 A.2d 1100 (Pa. 2009) regarding the evidence that is required to satisfy the elements of the offense of Possession of Child Pornography as defined by 18 Pa.C.S. §6312(d).  There is no evidence in this case, as there was in <u>Diodoro</u>, that Defendant intentionally searched for and viewed child pornography and, to the contrary, all of the evidence is consistent with Defendant's statement that he intended to acquire only adult pornography, and that the files of child pornography found on his hard drives were acquired accidentally through the Limewire file sharing software.  Once acquired, Mr. Piasecki was unable to delete the video files.

In *Commonwealth v. Diodoro*, supra, this Court considered the case in which a forensic computer examination of Defendant's computer had confirmed that defendant had accessed child pornography web sites and, by clicking the "next" button or a specific image, had accessed and viewed thirty images of child pornography. Diodoro, supra, 970 A.2d at 1101.  At trial, Appellant and the Commonwealth had stipulated that the:

Unlawful images were viewed by (Appellant) on his computer while he was searching the World Wide Web for images of females under age (16). *Id.*

§6312(d) of the Crimes Code provides that offense is committed when:

Any person knowingly possesses or controls[4] any...photograph, film, video tape, computer depiction or other material depicting a child under the age of 18 years, engaging in a prohibited sexual act or in the simulation of such act....

In <u>Diodoro</u>, the issue on appeal focused on the element that require the Defendant to "possess or control" the material. In <u>Diodoro</u>, the Defendant had simply viewed the images on his computer screen, and had not taken any further steps to download, acquire or transfer the images. <u>Diodoro</u>, supra, 970 A.2d at 1102-1104.  This court had specifically granted review to consider the question of whether "accessing and viewing" child pornography over the internet constitutes "control" of such pornography under 18 Pa.C.S. §6312(d).

---

[4] In 2009, the Legislature changed this offense to include any person who "intentionally views" child pornography.  Act 2009-15, §51. This offense now defines "intentionally views" as a "<u>Deliberate, purposeful, voluntary viewing</u>" of child (pornography). <u>The term shall not include the accidental or inadvertent viewing of such material</u>. 18 Pa C.S. §6312(g) (emphasis supplied).

Diodoro, while instructive, is not precisely on point as this Petition focuses on the requirement that the possession or control be "knowingly" by the Defendant. Nonetheless, this Court in Diodoro held that the elements of this offense was satisfied when the evidence shows that an individual:

> "Intentionally seeking out child pornography and purposefully making it appear on the computer screen-for however long the Defendant elects to view the image-itself constitutes knowing control."....

> It is clear that §6312(d) should not and cannot read to allow intentional and purposeful viewing of child pornography on the internet without consequence. Diodoro, Supra, 970 A.2d at 1107.

> ... purposefully searches (child pornography) out on the internet and intentionally views it on his computer. As the testimony in this case showed, in such a situation, the viewer has affirmatively clicked on images of child pornography from different web sites and the images are therefore purposefully on the computer screen before the viewer. Such conduct is clearly exercising power and/or influence over the separate images of child pornography because the viewer may, interalia, manipulate, download, copy, print, save or email the images....It is clear that §6312 (d) should not and cannot be read to allow intentional and purposeful viewing of child pornography on the internet without consequence. Diodoro, supra, 970 A. 2d. at 1105-1106. (emphasis supplied)

In the case of Jason Piasecki, there is virtually no evidence that he intentionally, knowingly or purposefully searched for, viewed or downloaded child pornography. To the contrary, all of the evidence supports Mr. Piasecki's contention that if child pornography on his computer, it was obtained accidentally while he was intentionally downloading adult pornography.

The 93 videos of child pornography found on the hard drive of Jason's computer were mixed in with over 4,000 videos of adult pornography. There was no segregation or filing of the child pornography. There was no evidence whatsoever that Jason had the slightest interest in child pornography.

The undisputed evidence demonstrates that Jason Piasecki is not intellectually equipped to conduct a focused search for pornography (or for anything else) on the internet. His mother testified that he cannot spell. N.T. 1/11/10, p.182. He can barely help his second grade son sound out words in his school books. Id., p.182-183. He calls his mother to ask about spelling of simple words. Id. Virtually all of the names of friends and family members on his cell phone were misspelled. Id. It

is hardly surprising that when he typed in a simple pornographic search term, the search may be overly broad and he then secured unwanted material. This is not the person, or the conduct, which the legislature intended to outlaw in §6312 (d).

Even if Jason had viewed child pornography that had been accidentally secured, the Commonwealth's evidence, though Jason's statement, shows that Jason's viewing was entirely accidental and would not be proscribed even under the recent amendments to Section 6312, which does not criminalize the "accidental or inadvertent" viewing of child pornography.

Mr. Lewis tried to teach Jason how to delete video files, and was unable to do so. Deleting from the Limewire software is a multiple stage process that Jason was absolutely incapable of mastering. After Mr. Lewis was unsuccessful in showing Jason how to delete his video files, he simply added another hard drive to Jason's computer.[5]

Petitioner respectfully submits that the Commonwealth's evidence, at best, demonstrates that Mr. Piasecki, after unknowingly acquiring child pornography, viewed it and was unable to delete it. Jason could not know what was on the video until he viewed it and he could not delete the video. We respectfully submit that under these circumstances, Jason cannot be said to knowingly either possess or control child pornography.

> 2. **The Superior Court erred in failing to reverse the Trial court's denial of Petitioner's Motion to Suppress Evidence regard to statements made to police officers, while interrogated in his home, in the presence of two detectives and two uniformed police officers, one of which uniformed police officers had taken custody of Petitioner's seven year old son into another room, without being read the warnings required by _Miranda v. Arizona_.**

This Petition involves the novel circumstance of the police taking custody of a suspects minor child, during interrogation in the suspects home, and the effect of that significant factor on the

---

[5]During closing argument, the Trial Court suggested that Jason could "pay someone" to delete the accidentally-acquired videos. N.T., 1/13/10, p. 69. The problem with this is that, under Diodoro, and the recent amendments to §6312(d) a "geek" or paid computer consultant would arguably be guilty of viewing, possessing or controlling the child pornography while going through the steps of deleting it. Also, the person knowingly deleting child pornography could be guilty of tampering with physical evidence in violation of 18 Pa. CS §5107). We daresay that no competent lawyer in the Commonwealth would assure a computer consultant that it was legally permissible to delete child pornography from a customer's computer.

determination of whether the suspect is undergoing a "custodial interrogation" requiring the so called Miranda warnings.

This Court has consistently recognized that the test for determining whether a suspect is being subjected to custodial interrogation is whether the individual being interrogated reasonably believes that his freedom of action is restricted. Commonwealth v. Williams, 650 A.2d 420, 427 (Pa. 1994). The facts in such cases are evaluated on a case-by-case basis, and the decision ultimately depends upon the vitality of the circumstances, giving due consideration to the "reasonable impression conveyed to the person interrogated". Commonwealth v. Gwynn, 723 A.2d 143, 148 (Pa. 1998).

The Miranda Court itself recognized that a variety of circumstances, short of a formal arrest, could make a suspect believe that he was in custody, and accordingly, the warnings mandated by the Miranda decision apply to any interrogation of individuals in a "police-dominated atmosphere." Miranda v. Arizona, 384 U.S. 436, 445 (1966).

Pennsylvania Appellate Courts have long recognized that interrogation within one's residence can, with no other coercive circumstances, constitute custodial interrogation because a Defendant in his home has "no where to go to terminate contact with the police." See, e.g. Commonwealth v. Gonzalez, 979 A.2d 879, 889 (Pa. Super Ct. 2009). In addition to the fact that this interrogation of Jason took place in his home, is the fact that during the police interview of Petitioner, the police had custody of his seven year old son. The Superior Court's Memorandum Opinion completely ignored this glaringly important fact.

This unique circumstance -the presence of a child during interrogation of a parent- Petitioner believes, particularly in an era when single parent homes are, unfortunately, all too common, will likely be a matter of further litigation. The police interrogation of adults who are, at the time, caring for one or more children is a matter of great, and growing, statewide significance. Yet this important fact was not acknowledged, discussed or addressed in the Superior Court decision.

Your Petitioner believes that the interrogation of Jason Piasecki, in his own home, by four police officers with his car blocked in by police vehicles, and with another vehicle parked in the street in front of Petitioner's home "in reserve", with Petitioner's son being "escorted" by a uniformed police officer to a different part of the home, and with another uniformed police officer stationed prominently in the doorway between Petitioner and his son, and which interview lasted 1 hour and 20 minutes, clearly resulted in a "police-dominated atmosphere" and should have resulted

in a finding that the police should have taken a few seconds to advise Petitioner of his <u>Miranda</u> warnings. It is inexcusable that the police did not do so, and the superficial consideration of this issue by the Superior Court was error.

## V.   CONCLUSION

For the above state reasons, Petitioner Jason Piasecki respectfully requests that this Honorable Court to allow him to Appeal from the Superior court's ruling of July 25, 2011.

Respectfully submitted,

BEGLEY, CARLIN & MANDIO, LLP

By:_____
    Douglas C. Maloney, Esquire
    Attorney I.D. No. 34388
    Attorney for Petitioner
    P.O. Box 308
    Langhorne, PA 19047
    215-750-0110

## VERIFICATION

I, Douglas C. Maloney, Esquire, state that I am attorney with the law firm of Begley, Carlin & Mandio, LLP, attorney for Plaintiff, who lacks sufficient knowledge or information to verify the statements in the foregoing Answer in that the statements contained therein are predicated upon the results of investigations that have not been communicated to the clients or involve legal interpretation; and therefore, under the provisions of Pa. R. Civ. P. 1024(c), I hereby verify that the statements made in the foregoing Answer and any attachment thereto are true and correct to the best of my information and belief. I understand that false statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relative to unsworn falsification to authorities.

BEGLEY, CARLIN & MANDIO, LLP

By:_____
            Douglas C. Maloney, Esquire
            Attorney I.D. #34388
            680 Middletown Boulevard
            P.O. Box 308
            Langhorne, PA 19047
            (215) 750-0110
            *Attorney for Petitioner, Jason Piasecki*

## PROOF OF SERVICE

I, Douglas C. Maloney, Esquire, hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below which service satisfies the requirements of Pa. R. A. P. 121:

### First Class Mail:

**Karen Diaz, Esquire**
**Office of the District Attorney**
**Bucks County Courthouse**
**55 East Court Street**
**Doylestown, PA 18901**

Begley, Carlin & Mandio, LLP

By: _____

Douglas C. Maloney, Esquire
680 Middletown Boulevard
P.O. Box 308
Langhorne, PA 19047-0308
(215) 750-0110 (phone)
(215) 750-0954 (fax)
*Attorney for Petitioner, Jason Piasecki*

#428022

**CERTIFICATE OF SERVICE**

I, Karen A. Diaz, Esquire, Deputy District Attorney of Bucks County, do hereby swear and affirm that on the 9th day of March, 2015, a true and correct copy of Respondent's Supplement is served upon the following in the manner indicated:

**VIA ELECTRONIC FILING:**

Clerk of the District Court
United States District Court
  for the Eastern District of Pennsylvania
2609 United States Courthouse
601 Market Street
Philadelphia, PA  19106

**VIA FIRST CLASS MAIL:**

The Honorable Marilyn Heffley
U.S. Magistrate Judge
United States District Court
  for the Eastern District of Pennsylvania
4001 United States Courthouse
601 Market Street
Philadelphia, PA  19106

Peter Goldberger, Esquire
50 Rittenhouse Place
Ardmore, PA 19003

Respectfully submitted,

/s/ Karen A. Diaz

kad9038

Karen A. Diaz, Deputy District Attorney
Attorney for the Commonwealth/Respondent
Attorney I.D. 56067
Office of the District Attorney
Bucks County Justice Center – 2nd Floor
100 N. Main Street
Doylestown, PA 18901
#(215) 348-6344