**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JASON PIASECKI, :
    Petitioner, 
  v. : **CIVIL ACTION NO.**
COURT OF COMMON PLEAS, : 2:14-CV-7004-LDD-MH
BUCKS COUNTY, PA, et al.,
    Respondents. :

**PETITIONER'S TRAVERSE AND REPLY**
**IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS**

    Jason Piasecki is a mentally disabled young adult (32 at the time of the alleged offenses) who lives with his parents, and has autism, as well as the IQ of an elementary school child. He was convicted in the Bucks County Court of Common Pleas of knowingly possessing or controlling, on April 1, 2009, some 15 short videos of child pornography, all in the form of "preview" files (out of thousands of sexually explicit images saved on his home computer), in violation of 18 Pa.C.S. § 6312(d). The evidence of knowing conduct was in oral statements he purportedly made to a police officer who came to the family home to execute a search warrant. The state court dismissed more serious charges (under 18 Pa.C.S. § 6312(c)) when the Commonwealth rested its case. The court placed Mr. Piasecki on three years' probation, which he completed. But he is now subject to years of onerous SORNA registration requirements. Because of the state court's relative leniency at sentencing, the respondents claim that the petitioner is not in "custody" and that this Court lacks jurisdiction to exercise its habeas corpus authority to review the sufficiency of the evidence and the admissibility of the incriminating statements. Those defenses should be rejected, or at least subjected to scrutiny at a hearing. On the merits, relief should be granted.

1. <u>Petitioner is in "custody" for habeas purposes.</u>

At sentencing, on April 26, 2010, the Court of Common Pleas for Bucks County, Pa. (Rea M. Boylan, J.), placed Jason Piasecki on three years' probation, which included an obligation that he be on the state's sex offender registry for ten years:

> [A]s to counts 16 to 30, as to each count the defendant is sentenced to 36 months' county probation. The conditions of his sentence are that he undergo sex offender supervision, that he be subject to ten-year registration, that he have no unsupervised contact with minor children under the age of 18, excluding your son ..., You're to have no computer Internet use. You're to continue in treatment .... You're not to drink, and you're to take medications as directed.

Sent.Tr. 13-14. The probation expired on May 24, 2013. The registration obligation imposed at sentencing on account of petitioner's conviction continues. By subsequent amendment, the period of registration for a Tier I offender is now 15 years. However, the sentencing court was mistaken about the duration of registration upon conviction for multiple counts, at least as interpreted by the Pennsylvania State Police. Both at the time of the offense (and sentencing) (<u>see</u> 42 Pa.C.S. § 9795.1(b)(1) (repealed)) and now (<u>see</u> 42 Pa.C.S. §§ 9799.13-.15), petitioner's offense (because of the multiple counts) was viewed as requiring lifetime registration; it now requires quarterly in-person reporting as well.[1]

The respondents claim that the expiration of petitioner's probation in April 2013 means that when he filed his federal petition in December 2014 he was not "in custody," thus depriving this Court of jurisdiction under 28 U.S.C. § 2254(a). The respondents

_____

[1] Possession of child pornography under Pennsylvania law is presently listed as a "Tier I" offense (lowest level under SORNA), which would thus trigger only annual re-registration. But the Pennsylvania Supreme Court interprets § 6312(d) as making the possession of each illicit image a separate count of conviction. See <u>Commonwealth v. Davidson</u>, 595 Pa. 1, 30-39, 938 A.2d 198, 215-21 (2007). Under § 9799.14(d)(16), a person with "two or more" convictions for a Tier I offense is deemed a Tier III (most serious) offender, triggering quarterly in-person registration for life. (Since federal law is the opposite -- simultaneous possession of any number if prohibited images constitutes but one count of possession under 18 U.S.C. §§ 2252(a)(4)(B) or 2252A(a)(5)(B) -- an otherwise identically situated person convicted under federal law would be in Tier I.) A grant of allocatur to reconsider this anomaly was unfortunately dismissed as improvidently granted last year. <u>Commonwealth v. Mielnicki</u>, 2014 WL 7150665 (Dec. 15, 2014).

rely on a broad reading of Supreme Court decisions which expressly describe their own holdings more narrowly. See Lackawanna County District Attorney v. Coss, 532 U.S. 394, 406 (2001) (acknowledging exceptions); Maleng v. Cook, 490 U.S. 488, 494 (1989) (per curiam).  In doing so, the respondents ignore the most pertinent Third Circuit precedent, Barry v. Bergen County Probation Dept., 128 F.3d 152, 159-162 (3d Cir. 1997).  In Barry, the Court held that an obligation to perform 500 hours of community service over a three-year period "significantly restrained [Barry's] liberty to do those things which in this country free [people] are entitled to do." 128 F.3d at 162 (second bracketed word per original), quoting Jones v. Cunningham, 371 U.S. 236, 240 (1963).

Petitioner's SORNA registration, triggered by his conviction under 18 Pa.C.S. § 6312(d) per 42 Pa.C.S. §§ 9799.13(2), 9799.14(b)(9), was imposed on him by the judge at the time of sentencing. Indeed, SORNA (§§ 9799.13 - 9799.14) (like the former Megan's Law, § 9795.1) was enacted and classified by the Legislature as part of Pennsylvania's "Sentencing" law (Title 42, chapter 97). This term of his sentence places restrictions on Mr. Piasecki's freedom of movement, including an obligation -- for the rest of his life -- to travel quarterly to a State Police Barracks and to remain there, behind locked doors, answering questions, on a regular basis (and also an unlimited number of additional times, depending on whether he changes his employment, his residence, his schooling, his telephone number(s), internet identifiers, or what vehicle he uses). See 42 Pa.C.S. § 9799.15(e),(g). These requirements are at least as severe and burdensome on physical liberty as the community service obligation involved in Barry. There is no indication in any of the cases cited by the respondents that the registration requirements at issue there entailed such obligations. Nor do those cases show that the obligation was explicitly articulated by the court at sentencing, as here.  Finally, insofar as they rely on a distinction between direct and collateral consequences of a criminal conviction, they fail to take into account the Supreme Court's recent erosion of that line,

where those consequences are as weighty as those involved here.  See Padilla v. Kentucky, 559 U.S. 356, 364-65 (2010).

The issue is not principally whether the SORNA registration requirement, in its present form, apart from being part of the sentence, is so arbitrary and extreme as to be punitive rather than remedial (although it is). Rather, the jurisdictional issue is whether petitioner's conviction, through SORNA, imposes restrictions on petitioner's physical liberty sufficient to constitute "custody" under Barry. Petitioner contends that it does. He therefore requests an evidentiary hearing to make a full and clear record of the ways that his SORNA registration obligation -- triggered directly and solely by his challenged conviction -- restrains his physical liberty, so as to place him in continuing "custody" under that judgment.

2.  Petitioner has exhausted his state remedies.

The respondents also place in question petitioner's satisfaction of the non-jurisdictional requirement that he have exhausted state remedies with respect to certain of his claims.  28 U.S.C. § 2254(b).[2] The respondents reason that because petitioner's probationary sentence expired after the hearing on his PCRA petition and order denying it, but before the PCRA court could write its opinion and the state appeal process could unfold, which required dismissal of his PCRA appeal under state law, he failed to exhaust remedies as to the issues presented in the habeas petition that were not raised on direct appeal. Those issues, moreover, are now procedurally defaulted due to having been decided on the "independent and adequate state ground" of the PCRA's in-custody requirement, the argument continues. This contention fails under controlling Third Circuit precedent, which respondents fail to cite.

_____

[2] Petitioner now concedes, however, that the separate "voluntariness" ground for suppression of his statements, while advanced in the pretrial motion and potentially meritorious, was not advanced in his brief on appeal to the Superior Court, and therefore was not exhausted.

–4–

In <u>Leyva v. Williams</u>, 504 F.3d 357, 368-69 (3d Cir. 2007), the Court addressed the precise question of how Pennsylvania's PCRA continuing "in-custody" requirement affects a federal habeas court's application of the exhaustion requirement.  Where, as here, a probationary or short prison sentence expired prior to the completion of a petitioner's PCRA appeal, the Third Circuit held, the exhaustion requirement does not bar federal review.  This is because the resulting state procedural default is excused by "cause and prejudice" if the petitioner sought diligently to pursue his remedies but was thwarted, through no fault of his own, by the in-custody requirement.

> Noncompliance with Pennsylvania's custody requirement did not result from any *failure* on the part of Leyva, but simply from the expiration of his sentence.  This factor was outside Leyva's control .... As we have explained, there is 'cause' for noncompliance with a state rule, when 'some objective factor external to the defense impeded ... efforts to comply with the ... rule.' ... Here, Leyva's failure to be in custody through the duration of his PCRA petition ... cannot 'fairly be attributed to him.' ... Accordingly, Leyva has cause for noncompliance.

504 F.3d at 369 (citations omitted). (The prejudice requirement merges with the merits.) For this reason, the respondents' second (and final) procedural defense[3] also fails.

    3.  <u>Relief on the Merits Should Be Granted</u>.

On the merits, as to most of his claims, petitioner is entitled to habeas corpus relief.

    a.  *Insufficiency of evidence*.  The Superior Court on direct appeal addressed the merits of Mr. Piasecki's due process/sufficiency claim and rendered a decision finding the evidence sufficient to support the verdict. Resp.Exh.E, at 2-4.  This decision was based on both an unreasonable assessment of the facts and an unreasonable application of established U.S. Supreme Court precedent. <u>See</u> 28 U.S.C. § 2254(d)(1),(2).  After a

---

[3] The respondents concede that the petition was timely filed, within one year after petitioner's challenged convictions "became final," not counting periods during which a properly filed application for state post-conviction review was "pending." 28 U.S.C. § 2244(d). They further conced that the direct-appeal issues (other than voluntariness) are exhausted.

quick review of the evidence in general terms,[4] the Superior Court wrote, "[W]e cannot say that the evidence was so weak and inconclusive that no probability of guilt could arise therefrom." Exh.E, at 4. Of course, this is far from the governing constitutional standard: "We have held that the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." Fiore v. White, 531 U.S. 225, 228-29 (2001) (per curiam), citing Jackson v. Virginia, 443 U.S. 307, 316 (1979). In Jackson, the Supreme Court held that in evaluating a federal habeas corpus petitioner's challenge to the sufficiency of the evidence following a conviction in state court, the constitutional question on appeal (or habeas) is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. 319 (emphasis in original). A "no probability of guilt" standard is simply not a reasonable application of this governing legal rule.

Applying the correct standard, the evidence of the knowledge element presented at trial was grossly insufficient. To act "knowingly" under Pennsylvania law means, "if the element involves the nature of his conduct or the attendant circumstances, [as here, that the defendant] is aware that his conduct is of that nature or that such circumstances exist." 18 Pa.C.S. § 302(b)(2)(i). Here, under the state supreme court's interpretation of § 6312(d) (see note 1 ante, citing Davidson), the possession of each video was a separate offense. Thus, actual knowledge by Jason Piasecki of his possession of each of the 15 charged videos on or about April 1, 2009 (as charged), and of the forbidden character of that particular video, had to be established beyond a reasonable doubt. In Commonwealth v. Diodoro, 601 Pa. 6, 18, 970 A.2d 1100, 1107 (2009), the state supreme court authoritatively construed § 6312(d), as it stood at the time involved here,

---

[4] The Superior Court's review focused on the inconsistencies in Mr. Piasecki's oral statements to the police, as reported by them, including their claim that he said he would "click" to the end of any child pornography that he saw. The court also relied on "the existence of the preview files." Exh.E, at 4.

as allowing proof of knowing possession by evidence that a defendant knowingly "download[ed], save[d] or print[ed] an image of child pornography from the internet, or knew of the existence of the images of child pornography on his hard drive ...."[5] This was not shown as to a single one of the fifteen counts, much less as to each and every one of them individually.  Possession of each video was a separate offense, so the required knowledge had to be established for each.[6]

      What the evidence showed, in the light most favorable to the Commonwealth, was that petitioner Piasecki may have been generally aware that among the thousands of adult pornographic images he downloaded (and willy-nilly saved in a couple of unsorted folders, Tr. 1/12, at 60) were a few that he was willing to agree, when prompted by a police officer, were "films involving children." Tr. 1/12, at 42. This could barely support an inference that he knew the general illicit character of the charged images. Certainly there was no evidence that he knew, when asked about the presence of child pornography, that any video he possessed portrayed child pornography, as defined. The terms and vocabulary of the questions the police asked him were not recorded or even

_____

[5] That Pennsylvania requires a strict standard of actual and positive knowledge under this statute is corroborated by the parallel definition of "intentionally views," an alternative means of committing the same offense (added to the statute in July 2009, after the date of the alleged offenses here): "The deliberate, purposeful, voluntary viewing of material depicting .... The term shall not include the accidental or inadvertent viewing of such material." 18 Pa.C.S. § 6312(g) (definition of "intentionally views").

[6] Nowhere in the record of this case is it possible to ascertain what, in particular, was charged in any of the 15 counts of conviction (Counts 16-30).  At one point, Agent Coleman testified there were 93 videos he considered to be obvious child pornography on the hard drive marked as Exh. C-1. Tr. (1/12), at 50. (This would be at most 2.3% of the saved files.) Later, he testified that these files, without identifying or describing a single one of them in particular, included depictions ranging "from month-old babies to anywhere under 10 years of age. Children being digitally penetrated, vaginally and anally, oral sex. All kind of various sex acts being performed in front of a video camera." Tr. 54. Coleman also testified that he found 18 "preview files" of child pornography, Tr. 55, ten of which were "downloaded to completion" and thus found as saved on the hard drive. Id. Nothing in the record allows the identification of fifteen particular video files at all, and thus nothing could establish the defendant-petitioner's specific knowledge with respect to any of them. Exhibit C-3 contained "the videos that were contained on the defendant's computer," and the defense stipulated that these constituted child pornography, Tr. 57, but there was no stipulation so far as any knowledge was concerned.

purportedly quoted verbatim at the hearing. The significance of Mr. Piasecki's conflicting and inconsistent answers depends in part on the precise questions that were asked. The police conceded that petitioner consistently maintained that he had "never searched for" videos depicting children. Tr. 1/12, at 43.

An image is not "child pornography" unless it depicts "a child under the age of 18 engaging in a prohibited sexual act or in the simulation of such act," § 6312(d), and a "prohibited sexual act" must be (as to each particular video) of a specific kind described in § 6312(g).[7]) Indeed, the only picture shown to Mr. Piasecki by Detective Cummins, who asked whether he was familiar with it, was of a fully clothed child not engaged in any sex act. Agent Coleman, the Commonwealth's forensic expert, conceded that it was not possible to say whether the person sitting at the computer at the time multiple files were downloaded from the Gnutella network via LimeWire or FrostWire had actually viewed any particular one of them, even though the file downloads as a "preview." As Coleman testified, when multiple files are downloaded at once, only one can be viewed at a time, while more "previews" are created in the computer's memory. Tr. 1/12, at 64.[8] Even the list of titles is more than can be seen on a single monitor screen; the user must choose to scroll down to see more, Tr. 63-64, and there is no evidence that Mr. Piasecki did so.  Indeed, the evidence is insufficient to conclude that he was even intellectually capable of <u>reading</u> the list of titles, <u>see</u> Resp.Exh. C, at 7-13 (citing Exh. C-4),  and understanding their significance, much less choosing files on that basis.

---

[7] <u>Compare</u> Tr. 54 (Coleman: "All kinds of various sex acts being performed ...."). This testimony alone could be viewed as negating sufficiency for any particular count.

[8] Agent Coleman testified that if multiple files were downloaded at the same time -- hundreds of adult videos, for example, and one with child pornography -- the preview files would have creation dates and times just seconds apart. He looked at only four or five to see whether this was so, and not seeing similar times, looked no further.  Tr. 1/12, at 68-69. As a result he could not say whether the child pornography underlying this case was received in that way, as the defense suggested. Tr. 72. The Commonwealth stipulated, however, that there was no evidence that Jason Piasecki sought out child pornography, and no corroborating evidence of any kind was found in the search to support an inference that he did.  Tr. 1/12, at 37-42.

These deficiencies in the specificity of proof must be considered in light of the evidence presented at the pretrial hearing, which was incorporated as part of the trial record by agreement (Tr. 1/12, at 30) without being repeated (at a bench trial before the same judge). The respondents greatly understate, if not misstate, this evidence (Resp. 27). The evidence (given by his adoptive mother, who has a Masters in Social Work and has worked for 40 years as a professional with special needs children[9]) was that Jason has needed special education since before kindergarten. At the time of trial, at age 32, he was able to read at a Third Grade level and do math at a Second Grade level. Tr. 1/11, at 176. His eight-year-old son had caught up with him in math. Tr. 183. "[H]e also has a difficult time with verbal information because it's hard for him to take it all in and understand the combination of the words and the social context." Tr. 176-77. He had tried and failed at 20 jobs. He could not make a hamburger at Burger King; he could not match hangers by size; he could not follow directions as a restaurant busman to pick table cloths by color that indicated their size for different tables.  He has to have it explained to him each week how to deposit all but $20 or $30 of a pay check. Tr. 181. He cannot spell words such as "today" or "summer," or remember the spellings of names of people whose numbers are saved on his phone. Tr. 182.  The respondents' claim that Mr. Piasecki was "admittedly familiar with the workings and usage of his own personal computer," Resp. 27, is just fanciful.

      Judged against the correct constitutional standard, the evidence at trial failed to prove the petitioner guilty of any of the charged fifteen offenses.  The Superior Court decision involves both an unreasonable determination of the facts and an unreasonable application of established federal law.  An absolute writ of habeas corpus must be granted.

---

[9] The only testimony from Marlene Piasecki that was excluded was her statement of Jason's autism diagnosis and of his tested IQ.  Tr. 1/11, at 174-75.

> b. *Petitioner's statements were inadmissible under* Miranda, *because he was "in custody" when interrogated by the police at his home, without warnings.*

The Superior Court on direct appeal again made an unreasonable determination of both the facts and the Supreme Court's clearly established constitutional law when it affirmed the trial court's denial of petitioner's pretrial motion to suppress his statements, made when the police came to his home to execute the search warrant. Habeas corpus relief therefore can and should be granted. 28 U.S.C. § 2254(d). The Superior Court applied its own test, which asks whether the defendant is "physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that freedom of action or movement is restricted by such interrogation." Exh. E, at 8. Put another way, according to the Superior Court, "police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest." Id. The test articulated by the U.S. Supreme Court, on the other hand, as respondents now correctly recognize, is "whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. Thompson v. Keohane, 516 U.S. 99, 112 (1995); Berkemer v. McCarty, 468 U.S. 420, 442 (1984)." Resp. 25.

These two standards are not equivalent; the state standard is expressed in partly personal, that is, subjective terms (what "he reasonably believes"). Most important, the federal test requires that the court take account of a suspect's objective characteristics that bear on the perception of a reasonable person in the suspect's position of whether s/he is free to leave. See J.D.B. v. North Carolina, 564 U.S. ---, 131 S.Ct. 2394 (2011) (age of 13-year-old interrogated at school). Since J.D.B. was decided a month prior to the issuance of the Superior Court opinion in petitioner's case, it was part of the "clearly established" law that the state court was required to follow. The Superior Court offered an unreasonable determination of the facts as well as an unreasonable application of this body of law when it commented that it was not "persuad[ed] that petitioner's "very

-10-

limited intelligence" and other "limitations, whatever they may be,[10] rendered the questioning by police a custodial interrogation." Resp. Exh. E, at 9.

      While fact-based, the determination of "custody" for habeas corpus purposes is ultimately a question of law that receives de novo, not deferential review, in cases where AEDPA deference does not apply. Thompson, supra. The circumstances of Mr. Piasecki's questioning by police are not controverted. He was home alone with his seven-year-old son (a fact not mentioned by the state courts in terms of whether a reasonable person in those circumstances would have felt objectively "free to leave"). The police did not at first state that they were present to execute a search warrant. They separated Mr. Piasecki from his young son, sat him on a couch between two officers, and asked him questions repeatedly for more than an hour. As already recounted, Mr. Piasecki has extreme intellectual and psychological limitations, as testified to without contradiction by his adoptive mother, a trained professional. These include a demonstrated inability to perform some of society's simplest jobs due to inability to follow basic instructions or perform the most elementary analytical tasks (matching hangers by size). His verbal and mathematical abilities are like those of a seven- or eight-year-old. In this light, it is utterly implausible to suppose that the police, with their training at interacting with the mentally ill and with those of lower verbal intelligence, noticed nothing at all out of the ordinary.

      The question under Miranda (the issue that was exhausted on appeal) is not whether Mr. Piasecki's responses were "voluntary." It is simply and only whether a reasonable person in his situation -- considering the objective and apparent characteristics of the suspect -- would "have felt he or she was at liberty to terminate the interrogation and leave," Thompson, 516 U.S. at 112, that is, in this case, to walk away from

---

[10] If the Superior Court was uncertain of Jason's "limitations," then it was unfamiliar with -- and not basing its decision upon -- the record. Those limitations (ADHD, which respondents emphasize, is the least of them) are clearly described in the transcript of the pretrial hearing.

his own home and his otherwise unsupervised child, leaving several strangers (police) in the home behind him. The Superior Court's response in the affirmative is unreasonable as a matter of fact and law. Because the police admittedly administered no warnings and secured no waiver before interrogating Mr. Piasecki, his statements should not have been admitted at trial. Yet they were admitted, and they formed the principal basis for the Superior Court's affirmance of his conviction. For this reason as well, a writ of habeas corpus must issue.

    c. *Destruction of evidence.*

Even though, as the Superior Court acknowledged, the method chosen by the police to seize the Piasecki computers did result in the erasure of electronic information that would have corroborated petitioner's defense, this did not violate his due process rights as defined by the Supreme Court of the United States in <u>Arizona v. Youngblood</u>, 488 U.S. 1 (1988).[11] Because the Superior Court on direct appeal (Resp. Exh. E, at 5-7) applied the correct legal standard established by U.S. Supreme Court precedent and did not result from an unreasonable assessment of the facts, <u>see</u> 28 U.S.C. § 2254(d), petitioner now withdraws his claim of a due process violation in the destruction of potentially exculpatory evidence.

---

[11] In this regard, the Court should take judicial notice of the subsequent, dramatic resolution of the case of Larry Youngblood himself, whose case led to the Supreme Court decision holding that governmental destruction of exculpatory evidence violates due process only if it occurred deliberately or in "bad faith." Youngblood was convicted of a horrible kidnap-rape of a child in 1983. In early August 2000, DNA evidence conclusively established the truth of what Youngblood and his lawyers had been arguing all along -- that he was innocent. <u>See</u> Whitaker, "DNA Frees Inmate Years After Justices Rejected Plea," N.Y. Times, Aug. 11, 2000 (available at http://www.crimelynx.com/dnayoung.html). By then, Youngblood had been incarcerated 17 years -- twelve of them since the Supreme Court said the destruction of exculpatory evidence had not violated his rights. As others have noted, it is only by luck that the victim in that case did not die. If he had, Larry Youngblood might well have been executed rather than vindicated. <u>See</u> O'Brien, "Op-Ed: Reasonable Doubt and DNA," Washington Post, Sept. 7, 2000 (available at http://www.deathpenaltyinfo.org/-node/646) ("Had Larry Youngblood been charged with first degree murder, he'd probably be dead now.").

d. *Ineffective assistance of trial counsel.*

Two issues of ineffective assistance of trial counsel were presented in the PCRA and renewed in petitioner's application for habeas corpus.

*(a) Corpus Delicti.*

Defense counsel at trial did not support his demurrer (argument for judgment of acquittal) with an invocation of Pennsylvania's *corpus delicti* rule, which operates both as a rule of evidence and as a special sufficiency rule, where the Commonwealth relies heavily on a defendant's statements. Here, in light of the facts that there was a bench trial and that the parties stipulated to inclusion in the trial record of the pretrial hearing testimony (which included the defendant's arguably inculpatory statements), the evidentiary aspect of the rule is not at issue. The argument is that trial counsel was ineffective in failing to invoke the aspect of the state's venerable *corpus delicti* rule which provides that evidence independent of the defendant's statements must establish beyond a reasonable doubt that a crime was committed (by someone), before those statements can be considered in the total mix to help establish that the defendant may be guilty of any or all of the charged offenses. See Commonwealth v. Reyes, 545 Pa. 374, 681 A.2d 724, 728-30 (1996), explained and applied in Jacobs v. Horn, 395 F.3d 92, 109-15 (3d Cir. 2005).

To establish in this case, at step one of a *corpus delicti* sufficiency analysis, that a crime was committed (by someone), the Commonwealth had to prove not simply the existence of child pornography on one of the seized hard drives, but that the possession was a knowing act.[12] And the court had to find this to be established by evidence independent of any statement by Jason Piasecki. For the reasons discussed under Point 3.a. above, the independent trial evidence was insufficient. In fact, the Superior Court's

---

[12] Trial counel testified at the PCRA hearing that he thought the mere presence of child pornogrphy on the computer hard drive would establish the *corpus delicti*. PCRA Tr. 4/4, at 176-77.

-13-

discussion of the evidence depended principally on its review of Mr. Piasecki's statements, not to establish his identity as the perpetrator (this was not disputed, if anyone in the family was guilty), but rather to establish his culpable knowledge. Accordingly, counsel was ineffective in failing to advance the *corpus delicti* rule in connection with his insufficiency arguments at trial and on appeal, and Mr. Piasecki was prejudiced by that failure.

He is therefore entitled to a writ of habeas corpus on this ground.

*(b) Statutory and constitutional electronic surveillance violations.*

The evidence used at trial to prove the existence of child pornography on the Piasecki computer was mostly derived from the search of that computer after its seizure under a warrant. The probable cause for the warrant, however, was derived from a prior warrantless intrusion by the police into the computer while it was operating in the Piasecki home. When a warrant is procured by the use of information derived from a prior search, and that search is unconstitutional, then the warrant and evidence obtained pursuant to that warrant are "fruit of the poisonous tree" and must be suppressed. Murray v. United States, 487 U.S. 533, 543 (1988).

The testimony at the PCRA hearing established that the police used eP2P and other software, not generally available to the public, PCRA Tr. 4/4/13, at 13-16, 111, to access parts of the Piasecki computer that were not voluntarily made available for public access via sharing. See PCRA Tr. 4/4, at 134-37, 151-59, 167, 170-73. Trial counsel admitted at the hearing that he did not investigate or understand these details of the police methods, and therefore did not include a motion to suppress physical evidence on this basis in his pretrial motions. Tr. 4/4, at 184-90, 200-01.

The use of enhanced technology to intrude inside the home constitutes a "search" under the Fourth Amendment and is not rendered reasonable by the mere fact that it is technologically feasible. See Kyllo v. United States, 533 U.S. 27 (2001). A personal computer, whether in the form of a "smart phone," a laptop or a desktop computer, is a

detailed repository of personal information and cannot be searched without a warrant, absent authorized and voluntary consent or some other exception to the warrant clause. Riley v. California, 573 U.S. ---, 134 S.Ct. 2473 (2014); United States v. Stabile, 633 F.3d 219, 230-34 (3d Cir. 2011).  Insofar as the police technology also captures real-time transmission of communications identifying information, those techniques also qualify as trap-and-trace or pen register devices.  Counsel's failure to raise any of these issues prejudiced Mr. Piasecki through the introduction at trial, without objection or proper motion, of information derived from the computers seized under the warrant obtained by use of these intrusions. While the exclusionary rule is not directly enforce-able by means of a habeas petition, Stone v. Powell, 428 U.S. 465 (1976), the ineffec-tive assistance of counsel for failure to pursue a meritorious suppression motion is cognizable.  Kimmelman v. Morrison, 477 U.S. 365 (1986).

For this final reason, a writ of habeas corpus should issue.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus should be granted.  If necessary, the Court should hold an evidentiary hearing on the question whether petitioner Piasecki is "in custody" under the SORNA registration regime imposed as a result of his conviction and as part of his sentence.

Dated:  May 11, 2015

Respectfully submitted,
THE PETITIONER

*s/Peter Goldberger*
By:   PETER GOLDBERGER
50 Rittenhouse Place
Ardmore, PA  19003
 (610) 649-8200
fax: (610) 649-8362
e-mail: peter.goldberger@verizon.net

Attorney for the Petitioner

## CERTIFICATE OF SERVICE

On May 11, 2015, I served the foregoing Traverse/Reply on the attorney of record for the respondents via the automated process of this Court's CM/ECF system, addressed to:

    Karen A. Diaz, Esq.
    Deputy District Attorney
     & Chief of Legal Division
    Bucks County Justice Center, 2d Fl.
    100 No. Main Street
    Doylestown, PA  18901

                                                  ____*s/Peter Goldberger*_____